# BURGER KING CORP. *v.* RUDZEWICZ

No. 83–2097.   Argued January 8, 1985—Decided May 20, 1985

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and MARSHALL, BLACKMUN, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, in which WHITE, J., joined, *post*, p. 487. POWELL, J., took no part in the consideration or decision of the case.

*Joel S. Perwin* argued the cause and filed briefs for appellant.

*Thomas H. Oehmke* argued the cause and filed a brief for appellee.

JUSTICE BRENNAN delivered the opinion of the Court.

The State of Florida's long-arm statute extends jurisdiction to "[a]ny person, whether or not a citizen or resident of this state," who, *inter alia*, "[b]reach[es] a contract in this state by failing to perform acts required by the contract to be performed in this state," so long as the cause of action

arises from the alleged contractual breach.   Fla. Stat. § 48.193 (1)(g) (Supp. 1984).   The United States District Court for the Southern District of Florida, sitting in diversity, relied on this provision in exercising personal jurisdiction over a Michigan resident who allegedly had breached a franchise agreement with a Florida corporation by failing to make required payments in Florida.   The question presented is whether this exercise of long-arm jurisdiction offended "traditional conception[s] of fair play and substantial justice" embodied in the Due Process Clause of the Fourteenth Amendment.   *International Shoe Co.* v. *Washington*, 326 U. S. 310, 320 (1945).

## I

### A

Burger King Corporation is a Florida corporation whose principal offices are in Miami.   It is one of the world's largest restaurant organizations, with over 3,000 outlets in the 50 States, the Commonwealth of Puerto Rico, and 8 foreign nations.   Burger King conducts approximately 80% of its business through a franchise operation that the company styles the "Burger King System"—"a comprehensive restaurant format and operating system for the sale of uniform and quality food products."   App. 46.[1]   Burger King licenses its franchisees to use its trademarks and service marks for a period of 20 years and leases standardized restaurant facilities to them for the same term.   In addition, franchisees acquire a variety of proprietary information concerning the "standards, specifications, procedures and methods for op-

---

[1] Burger King's standard Franchise Agreement further defines this system as "a restaurant format and operating system, including a recognized design, decor, color scheme and style of building, uniform standards, specifications and procedures of operation, quality and uniformity of products and services offered, and procedures for inventory and management control . . . ."   App. 43.

erating a Burger King Restaurant." *Id.*, at 52. They also receive market research and advertising assistance; ongoing training in restaurant management;[2] and accounting, cost-control, and inventory-control guidance. By permitting franchisees to tap into Burger King's established national reputation and to benefit from proven procedures for dispensing standardized fare, this system enables them to go into the restaurant business with significantly lowered barriers to entry.[3]

In exchange for these benefits, franchisees pay Burger King an initial $40,000 franchise fee and commit themselves to payment of monthly royalties, advertising and sales promotion fees, and rent computed in part from monthly gross sales. Franchisees also agree to submit to the national organization's exacting regulation of virtually every conceivable aspect of their operations.[4] Burger King imposes these standards and undertakes its rigid regulation out of conviction that "[u]niformity of service, appearance, and quality of product is essential to the preservation of the Burger King image and the benefits accruing therefrom to both Franchisee and Franchisor." *Id.*, at 31.

Burger King oversees its franchise system through a two-tiered administrative structure. The governing contracts

---

[2] Mandatory training seminars are conducted at Burger King University in Miami and at Whopper College Regional Training Centers around the country. See *id.*, at 39; 6 Record 540–541.

[3] See App. 43–44. See generally H. Brown, Franchising Realities and Remedies 6–7, 16–17 (2d ed. 1978).

[4] See, *e. g.*, App. 24–25, 26 (range, "quality, appearance, size, taste, and processing" of menu items), 31 ("standards of service and cleanliness"), 32 (hours of operation), 47 ("official mandatory restaurant operating standards, specifications and procedures"), 48–50 (building layout, displays, equipment, vending machines, service, hours of operation, uniforms, advertising, and promotion), 53 (employee training), 55–56 (accounting and auditing requirements), 59 (insurance requirements). Burger King also imposes extensive standards governing franchisee liability, assignments, defaults, and termination. See *id.*, at 61–74.

provide that the franchise relationship is established in Miami and governed by Florida law, and call for payment of all required fees and forwarding of all relevant notices to the Miami headquarters.[5] The Miami headquarters sets policy and works directly with its franchisees in attempting to resolve major problems. See nn. 7, 9, *infra.* Day-to-day monitoring of franchisees, however, is conducted through a network of 10 district offices which in turn report to the Miami headquarters.

The instant litigation grows out of Burger King's termination of one of its franchisees, and is aptly described by the franchisee as "a divorce proceeding among commercial partners." 5 Record 4. The appellee John Rudzewicz, a Michigan citizen and resident, is the senior partner in a Detroit accounting firm. In 1978, he was approached by Brian MacShara, the son of a business acquaintance, who suggested that they jointly apply to Burger King for a franchise in the Detroit area. MacShara proposed to serve as the manager of the restaurant if Rudzewicz would put up the investment capital; in exchange, the two would evenly share the profits. Believing that MacShara's idea offered attractive investment and tax-deferral opportunities, Rudzewicz agreed to the venture. 6 *id.*, at 438–439, 444, 460.

Rudzewicz and MacShara jointly applied for a franchise to Burger King's Birmingham, Michigan, district office in the autumn of 1978. Their application was forwarded to Burger King's Miami headquarters, which entered into a preliminary agreement with them in February 1979. During the ensuing four months it was agreed that Rudzewicz and MacShara would assume operation of an existing facility in Drayton Plains, Michigan. MacShara attended the prescibed management courses in Miami during this period, see n. 2, *supra,* and the franchisees purchased $165,000 worth of restaurant equipment from Burger King's Davmor Industries division in

---

[5] See *id.*, at 10–11, 37, 43, 72–73, 113. See *infra*, at 481.

Miami. Even before the final agreements were signed, however, the parties began to disagree over site-development fees, building design, computation of monthly rent, and whether the franchisees would be able to assign their liabilities to a corporation they had formed.[6] During these disputes Rudzewicz and MacShara negotiated both with the Birmingham district office and with the Miami headquarters.[7] With some misgivings, Rudzewicz and MacShara finally obtained limited concessions from the Miami headquarters,[8] signed the final agreements, and commenced operations in June 1979. By signing the final agreements, Rudzewicz obligated himself personally to payments exceeding $1 million over the 20-year franchise relationship.

---

[6] The latter two matters were the major areas of disagreement. Notwithstanding that Burger King's franchise offering advised that minimum rent would be based on a percentage of "approximated capitalized site acquisition and construction costs," id., at 23, Rudzewicz assumed that rent would be a function solely of renovation costs, and he thereby underestimated the minimum monthly rent by more than $2,000. The District Court found Rudzewicz' interpretation "incredible." 7 Record 649.

With respect to assignment, Rudzewicz and MacShara had formed RMBK Corp. with the intent of assigning to it all of their interest and liabilities in the franchise. Consistent with the contract documents, however, Burger King insisted that the two remain personally liable for their franchise obligations. See App. 62, 109. Although the franchisees contended that Burger King officials had given them oral assurances concerning assignment, the District Court found that pursuant to the parol evidence rule any such assurances "even if they had been made and were misleading were joined and merged" into the final agreement. 7 Record 648.

[7] Although Rudzewicz and MacShara dealt with the Birmingham district office on a regular basis, they communicated directly with the Miami headquarters in forming the contracts; moreover, they learned that the district office had "very little" decisionmaking authority and accordingly turned directly to headquarters in seeking to resolve their disputes. 5 id., at 292. See generally App. 5–6; 5 Record 167–168, 174–179, 182–184, 198–199, 217–218, 264–265, 292–294; 6 id., at 314–316, 363, 373, 416, 463, 496.

[8] They were able to secure a $10,439 reduction in rent for the third year. App. 82; 5 Record 222–223; 6 id., at 500.

The Drayton Plains facility apparently enjoyed steady business during the summer of 1979, but patronage declined after a recession began later that year. Rudzewicz and MacShara soon fell far behind in their monthly payments to Miami. Headquarters sent notices of default, and an extended period of negotiations began among the franchisees, the Birmingham district office, and the Miami headquarters. After several Burger King officials in Miami had engaged in prolonged but ultimately unsuccessful negotiations with the franchisees by mail and by telephone,[9] headquarters terminated the franchise and ordered Rudzewicz and MacShara to vacate the premises. They refused and continued to occupy and operate the facility as a Burger King restaurant.

## B

Burger King commenced the instant action in the United States District Court for the Southern District of Florida in May 1981, invoking that court's diversity jurisdiction pursuant to 28 U. S. C. § 1332(a) and its original jurisdiction over federal trademark disputes pursuant to § 1338(a).[10] Burger King alleged that Rudzewicz and MacShara had breached their franchise obligations "within [the jurisdiction of] this district court" by failing to make the required payments "at plaintiff's place of business in Miami, Dade County, Florida," ¶ 6, App. 121, and also charged that they were tortiously in-

---

[9] Miami's policy was to "deal directly" with franchisees when they began to encounter financial difficulties, and to involve district office personnel only when necessary. 5 id., at 95. In the instant case, for example, the Miami office handled all credit problems, ordered cost-cutting measures, negotiated for a partial refinancing of the franchisees' debts, communicated directly with the franchisees in attempting to resolve the dispute, and was responsible for all termination matters. See 2 id., at 59–69; 5 id., at 84–89, 94–95, 97–98, 100–103, 116–128, 151–152, 158, 163; 6 id., at 395–397, 436–438, 510–511, 524–525.

[10] Rudzewicz and MacShara were served in Michigan with summonses and copies of the complaint pursuant to Federal Rule of Civil Procedure 4. 2 id., at 102–103.

fringing its trademarks and service marks through their continued, unauthorized operation as a Burger King restaurant, ¶¶ 35–53, App. 130–135. Burger King sought damages, injunctive relief, and costs and attorney's fees. Rudzewicz and MacShara entered special appearances and argued, *inter alia,* that because they were Michigan residents and because Burger King's claim did not "arise" within the Southern District of Florida, the District Court lacked personal jurisdiction over them. The District Court denied their motions after a hearing, holding that, pursuant to Florida's long-arm statute, "a non-resident Burger King franchisee is subject to the personal jurisdiction of this Court in actions arising out of its franchise agreements." *Id.,* at 138. Rudzewicz and MacShara then filed an answer and a counterclaim seeking damages for alleged violations by Burger King of Michigan's Franchise Investment Law, Mich. Comp. Laws § 445.1501 *et seq.* (1979).

After a 3-day bench trial, the court again concluded that it had "jurisdiction over the subject matter and the parties to this cause." App. 159. Finding that Rudzewicz and MacShara had breached their franchise agreements with Burger King and had infringed Burger King's trademarks and service marks, the court entered judgment against them, jointly and severally, for $228,875 in contract damages. The court also ordered them "to immediately close Burger King Restaurant Number 775 from continued operation or to immediately give the keys and possession of said restaurant to Burger King Corporation," *id.,* at 163, found that they had failed to prove any of the required elements of their counterclaim, and awarded costs and attorney's fees to Burger King.

Rudzewicz appealed to the Court of Appeals for the Eleventh Circuit.[11]  A divided panel of that Circuit reversed the

---

[11] MacShara did not appeal his judgment.  See *Burger King Corp.* v. *MacShara,* 724 F. 2d 1505, 1506, n. 1 (CA11 1984).  In addition, Rudzewicz entered into a compromise with Burger King and waived his right to

judgment, concluding that the District Court could not properly exercise personal jurisdiction over Rudzewicz pursuant to Fla. Stat. § 48.193(1)(g) (Supp. 1984) because "the circumstances of the Drayton Plains franchise and the negotiations which led to it left Rudzewicz bereft of reasonable notice and financially unprepared for the prospect of franchise litigation in Florida." *Burger King Corp.* v. *MacShara,* 724 F. 2d 1505, 1513 (1984). Accordingly, the panel majority concluded that "[j]urisdiction under these circumstances would offend the fundamental fairness which is the touchstone of due process." *Ibid.*

Burger King appealed the Eleventh Circuit's judgment to this Court pursuant to 28 U. S. C. § 1254(2), and we postponed probable jurisdiction. 469 U. S. 814 (1984). Because it is unclear whether the Eleventh Circuit actually held that Fla. Stat. § 48.193(1)(g) (Supp. 1984) *itself* is unconstitutional as applied to the circumstances of this case, we conclude that jurisdiction by appeal does not properly lie and therefore dismiss the appeal.[12] Treating the jurisdictional

appeal the District Court's finding of trademark infringement and its entry of injunctive relief. See 4 Record 804–816. Accordingly, we need not address the extent to which the tortious act provisions of Florida's long-arm statute, see Fla. Stat. § 48.193(1)(b) (Supp. 1984), may constitutionally extend to out-of-state trademark infringement. Cf. *Calder* v. *Jones,* 465 U. S. 783, 788–789 (1984) (tortious out-of-state conduct); *Keeton* v. *Hustler Magazine, Inc.,* 465 U. S. 770, 776 (1984) (same).

[12] The District Court had found both that Rudzewicz fell within the reach of Florida's long-arm statute and that the exercise of jurisdiction was constitutional. The Court of Appeals did not consider the statutory question, however, because, as Burger King acknowledged at argument, that court "accepted the parties' stipulation" that § 48.193 reached Rudzewicz "in lieu of [making] a determination of what Florida law provides." Tr. of Oral Arg. 12. Burger King contends that an appeal is proper "on the basis of the Circuit Court's holding that *given that stipulation* the statute was unconstitutional as applied." *Id.,* at 13 (emphasis added).

We disagree. Our "overriding policy, historically encouraged by Congress, of minimizing the mandatory docket of this Court in the interests of sound judicial administration," *Gonzalez* v. *Automatic Employees Credit Union,* 419 U. S. 90, 98 (1974) (construing 28 U. S. C. § 1253), would be

statement as a petition for a writ of certiorari, see 28 U. S. C. § 2103, we grant the petition and now reverse.

## II

### A

The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a

threatened if litigants could obtain an appeal through the expedient of stipulating to a particular construction of state law where state law might in fact be in harmony with the Federal Constitution. Jurisdiction under 28 U. S. C. § 1254(2) is properly invoked only where a court of appeals *squarely* has "held" that a state statute is unconstitutional on its face or as applied; jurisdiction does not lie if the decision might rest on other grounds. *Public Service Comm'n* v. *Batesville Telephone Co.*, 284 U. S. 6, 7 (1931) *(per curiam)*. Consistent with "our practice of strict construction" of § 1254(2), *Fornaris* v. *Ridge Tool Co.*, 400 U. S. 41, 42, n. 1 (1970) *(per curiam)*, we believe that an appeal cannot lie where a court of appeals' judgment rests solely on the stipulated applicability of state law. Rather, it must be reasonably clear that the court independently concluded that the challenged statute governs the case and held the statute itself unconstitutional as so applied. The Court of Appeals did neither in this case, concluding simply that "[j]urisdiction under these circumstances would offend the fundamental fairness which is the touchstone of due process." 724 F. 2d, at 1513.

Of course, if it were clear under Florida law that § 48.193(1)(g) governed every transaction falling within its literal terms, there could be no objection to a stipulation that merely recognized this established construction. But the Florida Supreme Court has not ruled on the breadth of § 48.193 (1)(g), and several state appellate courts have held that the provision extends only to the limits of the Due Process Clause. See, *e. g., Scordilis* v. *Drobnicki*, 443 So. 2d 411, 412–414 (Fla. App. 1984); *Lakewood Pipe of Texas, Inc.* v. *Rubaii*, 379 So. 2d 475, 477 (Fla. App. 1979), appeal dism'd, 383 So. 2d 1201 (Fla. 1980); *Osborn* v. *University Society, Inc.*, 378 So. 2d 873, 874 (Fla. App. 1979). If § 48.193(1)(g) is construed and applied in accordance with due process limitations as a matter of state law, then an appeal is improper because the statute cannot be "invalid as repugnant to the Constitution . . . of the United States," 28 U. S. C. § 1254(2), since its boundaries are defined by, rather than being in excess of, the Due Process Clause. See, *e. g., Calder* v. *Jones, supra,* at 787–788, n. 7; *Kulko* v. *California Superior Court*, 436 U. S. 84, 90, and n. 4 (1978).

forum with which he has established no meaningful "contacts, ties, or relations." *International Shoe Co.* v. *Washington,* 326 U. S., at 319.[13] By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," *Shaffer* v. *Heitner,* 433 U. S. 186, 218 (1977) (STEVENS, J., concurring in judgment), the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit," *World-Wide Volkswagen Corp.* v. *Woodson,* 444 U. S. 286, 297 (1980).

Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there,[14] this "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, *Keeton* v. *Hustler Magazine, Inc.,* 465 U. S. 770, 774 (1984), and the litigation results from alleged injuries that "arise out of or relate to" those activities, *Helicopteros Nacionales de Colombia, S.A.* v. *Hall,* 466 U. S. 408, 414

---

[13] Although this protection operates to restrict state power, it "must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause" rather than as a function "of federalism concerns." *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee,* 456 U. S. 694, 702–703, n. 10 (1982).

[14] We have noted that, because the personal jurisdiction requirement is a waivable right, there are a "variety of legal arrangements" by which a litigant may give "express or implied consent to the personal jurisdiction of the court." *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee, supra,* at 703. For example, particularly in the commercial context, parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction. See *National Equipment Rental, Ltd.* v. *Szukhent,* 375 U. S. 311 (1964). Where such forum-selection provisions have been obtained through "freely negotiated" agreements and are not "unreasonable and unjust," *The Bremen* v. *Zapata Off-Shore Co.,* 407 U. S. 1, 15 (1972), their enforcement does not offend due process.

(1984).[15]  Thus "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State" and those products subsequently injure forum consumers.  *World-Wide Volkswagen Corp.* v. *Woodson, supra,* at 297–298.  Similarly, a publisher who distributes magazines in a distant State may fairly be held accountable in that forum for damages resulting there from an allegedly defamatory story.  *Keeton* v. *Hustler Magazine, Inc., supra;* see also *Calder* v. *Jones,* 465 U. S. 783 (1984) (suit against author and editor).  And with respect to interstate contractual obligations, we have emphasized that parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to regulation and sanctions in the other State for the consequences of their activities.  *Travelers Health Assn.* v. *Virginia,* 339 U. S. 643, 647 (1950).  See also *McGee* v. *International Life Insurance Co.,* 355 U. S. 220, 222–223 (1957).

We have noted several reasons why a forum legitimately may exercise personal jurisdiction over a nonresident who "purposefully directs" his activities toward forum residents.  A State generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.  *Id.,* at 223; see also *Keeton* v. *Hustler Magazine, Inc., supra,* at 776.  Moreover, where individuals "purposefully derive benefit" from their interstate activities, *Kulko* v. *California Superior Court,*

---

[15] "Specific" jurisdiction contrasts with "general" jurisdiction, pursuant to which "a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A.* v. *Hall,* 466 U. S., at 414, n. 9; see also *Perkins* v. *Benguet Consolidated Mining Co.,* 342 U. S. 437 (1952).

436 U. S. 84, 96 (1978), it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed. And because "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where. he engages in economic activity," it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity. *McGee* v. *International Life Insurance Co.*, *supra*, at 223.

Notwithstanding these considerations, the constitutional touchstone remains whether the defendant purposefully established "minimum contacts" in the forum State. *International Shoe Co.* v. *Washington, supra*, at 316. Although it has been argued that foreseeability of causing *injury* in another State should be sufficient to establish such contacts there when policy considerations so require,[16] the Court has consistently held that this kind of foreseeability is not a "sufficient benchmark" for exercising personal jurisdiction. *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S., at 295. Instead, "the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.*, at 297. In defining when it is that a potential defendant should "reasonably anticipate" out-of-state litigation, the Court frequently has drawn from the reasoning of *Hanson* v. *Denckla*, 357 U. S. 235, 253 (1958):

> "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The appli-

---

[16] See, *e. g., World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 299 (1980) (BRENNAN, J., dissenting); *Shaffer* v. *Heitner*, 433 U. S. 186, 219 (1977) (BRENNAN, J., concurring in part and dissenting in part).

cation of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S., at 774; *World-Wide Volkswagen Corp.* v. *Woodson, supra,* at 299, or of the "unilateral activity of another party or a third person," *Helicopteros Nacionales de Colombia, S.A.* v. *Hall, supra,* at 417.[17] Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State. *McGee* v. *International Life Insurance Co., supra,* at 223; see also *Kulko* v. *California Superior Court, supra,* at 94, n. 7.[18] Thus where the defendant "deliberately" has

---

[17] Applying this principle, the Court has held that the Due Process Clause forbids the exercise of personal jurisdiction over an out-of-state automobile distributor whose only tie to the forum resulted from a customer's decision to drive there, *World-Wide Volkswagen Corp.* v. *Woodson, supra;* over a divorced husband sued for child-support payments whose only affiliation with the forum was created by his former spouse's decision to settle there, *Kulko* v. *California Superior Court,* 436 U. S. 84 (1978); and over a trustee whose only connection with the forum resulted from the settlor's decision to exercise her power of appointment there, *Hanson* v. *Denckla,* 357 U. S. 235 (1958). In such instances, the defendant has had no "clear notice that it is subject to suit" in the forum and thus no opportunity to "alleviate the risk of burdensome litigation" there. *World-Wide Volkswagen Corp.* v. *Woodson, supra,* at 297.

[18] So long as it creates a "substantial connection" with the forum, even a single act can support jurisdiction. *McGee* v. *International Life Insurance Co.,* 355 U. S., at 223. The Court has noted, however, that "some single or occasional acts" related to the forum may not be sufficient to establish jurisdiction if "their nature and quality and the circumstances of their commission" create only an "attenuated" affiliation with the forum. *International Shoe Co.* v. *Washington,* 326 U. S. 310, 318 (1945); *World-*

engaged in significant activities within a State, *Keeton* v. *Hustler Magazine, Inc., supra,* at 781, or has created "continuing obligations" between himself and residents of the forum, *Travelers Health Assn.* v. *Virginia,* 339 U. S., at 648, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there. *Keeton* v. *Hustler Magazine, Inc., supra,* at 774–775; see also *Calder* v. *Jones,* 465 U. S., at 788–790; *McGee* v. *International Life Insurance Co.,* 355 U. S., at 222–223. Cf. *Hoopeston Canning Co.* v. *Cullen,* 318 U. S. 313, 317 (1943).

Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *International Shoe Co.* v. *Washington,* 326 U. S., at 320. Thus

---

*Wide Volkswagen Corp.* v. *Woodson,* 444 U. S., at 299. This distinction derives from the belief that, with respect to this category of "isolated" acts, *id.,* at 297, the reasonable foreseeability of litigation in the forum is substantially diminished.

courts in "appropriate case[s]" may evaluate "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies." *World-Wide Volkswagen Corp.* v. *Woodson,* 444 U. S., at 292. These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. See, *e. g., Keeton* v. *Hustler Magazine, Inc., supra,* at 780; *Calder* v. *Jones, supra,* at 788–789; *McGee* v. *International Life Insurance Co., supra,* at 223–224. On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. Most such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional. For example, the potential clash of the forum's law with the "fundamental substantive social policies" of another State may be accommodated through application of the forum's choice-of-law rules.[19] Similarly, a defendant claiming substantial inconvenience may seek a change of venue.[20] Nevertheless, minimum requirements inherent in the concept of "fair play and substan-

---

[19] See *Allstate Insurance Co.* v. *Hague,* 449 U. S. 302, 307–313 (1981) (opinion of BRENNAN, J.). See generally Restatement (Second) of Conflict of Laws §§ 6, 9 (1971).

[20] See, *e. g.,* 28 U. S. C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought"). This provision embodies in an expanded version the common-law doctrine of *forum non conveniens,* under which a court in appropriate circumstances may decline to exercise its jurisdiction in the interest of the "easy, expeditious and inexpensive" resolution of a controversy in another forum. See *Gulf Oil Corp.* v. *Gilbert,* 330 U. S. 501, 508–509 (1947).

tial justice" may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities. *World-Wide Volkswagen Corp.* v. *Woodson, supra,* at 292; see also Restatement (Second) of Conflict of Laws §§ 36–37 (1971). As we previously have noted, jurisdictional rules may not be employed in such a way as to make litigation "so gravely difficult and inconvenient" that a party unfairly is at a "severe disadvantage" in comparison to his opponent. *The Bremen* v. *Zapata Off-Shore Co.,* 407 U. S. 1, 18 (1972) (*re* forum-selection provisions); *McGee* v. *International Life Insurance Co., supra,* at 223–224.

## B

### (1)

Applying these principles to the case at hand, we believe there is substantial record evidence supporting the District Court's conclusion that the assertion of personal jurisdiction over Rudzewicz in Florida for the alleged breach of his franchise agreement did not offend due process. At the outset, we note a continued division among lower courts respecting whether and to what extent a contract can constitute a "contact" for purposes of due process analysis.[21] If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot. The Court long ago rejected the notion that personal jurisdiction might turn on "mechanical" tests, *International Shoe Co.* v. *Washington, supra,* at 319, or on "conceptualistic . . . theories of the place of contracting or of performance," *Hoopeston Canning Co.* v. *Cullen,*

---

[21] See, *e. g., Lakeside Bridge & Steel Co.* v. *Mountain State Construction Co.,* 445 U. S. 907, 909–910 (1980) (WHITE, J., dissenting from denial of certiorari) (collecting cases); Brewer, Jurisdiction in Single Contract Cases, 6 U. Ark. Little Rock L. J. 1, 7–11, 13 (1983); Note, Long-Arm Jurisdiction in Commercial Litigation: When is a Contract a Contact?, 61 B. U. L. Rev. 375, 384–388 (1981).

318 U. S., at 316. Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Id.*, at 316–317. It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

In this case, no physical ties to Florida can be attributed to Rudzewicz other than MacShara's brief training course in Miami.[22] Rudzewicz did not maintain offices in Florida and, for all that appears from the record, has never even visited there. Yet this franchise dispute grew directly out of "a contract which had a *substantial* connection with that State." *McGee* v. *International Life Insurance Co.*, 355 U. S., at 223 (emphasis added). Eschewing the option of operating an independent local enterprise, Rudzewicz deliberately "reach[ed] out beyond" Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and

---

[22] The Eleventh Circuit held that MacShara's presence in Florida was irrelevant to the question of Rudzewicz' minimum contacts with that forum, reasoning that "Rudzewicz and MacShara never formed a partnership" and "signed the agreements in their individual capacities." 724 F. 2d, at 1513, n. 14. The two did jointly form a corporation through which they were seeking to conduct the franchise, however. See n. 6, *supra.* They were required to decide which one of them would travel to Florida to satisfy the training requirements so that they could commence business, and Rudzewicz participated in the decision that MacShara would go there. We have previously noted that when commercial activities are "carried on in behalf of" an out-of-state party those activities may sometimes be ascribed to the party, *International Shoe Co.* v. *Washington*, 326 U. S. 310, 320 (1945), at least where he is a "primary participan[t]" in the enterprise and has acted purposefully in directing those activities, *Calder* v. *Jones*, 465 U. S., at 790. Because MacShara's matriculation at Burger King University is not pivotal to the disposition of this case, we need not resolve the permissible bounds of such attribution.

the manifold benefits that would derive from affiliation with a nationwide organization. *Travelers Health Assn.* v. *Virginia,* 339 U. S., at 647. Upon approval, he entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida. In light of Rudzewicz' voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the "quality and nature" of his relationship to the company in Florida can in no sense be viewed as "random," "fortuitous," or "attenuated." *Hanson* v. *Denckla,* 357 U. S., at 253; *Keeton* v. *Hustler Magazine, Inc.,* 465 U. S., at 774; *World-Wide Volkswagen Corp.* v. *Woodson,* 444 U. S., at 299. Rudzewicz' refusal to make the contractually required payments in Miami, and his continued use of Burger King's trademarks and confidential business information after his termination, caused foreseeable injuries to the corporation in Florida. For these reasons it was, at the very least, presumptively reasonable for Rudzewicz to be called to account there for such injuries.

The Court of Appeals concluded, however, that in light of the supervision emanating from Burger King's district office in Birmingham, Rudzewicz reasonably believed that "the Michigan office was for all intents and purposes the embodiment of Burger King" and that he therefore had no "reason to anticipate a Burger King suit outside of Michigan." 724 F. 2d, at 1511. See also *post,* at 488–489 (STEVENS, J., dissenting). This reasoning overlooks substantial record evidence indicating that Rudzewicz most certainly knew that he was affiliating himself with an enterprise based primarily in Florida. The contract documents themselves emphasize that Burger King's operations are conducted and supervised from the Miami headquarters, that all relevant notices and payments must be sent there, and that the agreements were made in and enforced from Miami. See n. 5, *supra.* Moreover, the parties' actual course of dealing repeatedly confirmed that decisionmaking authority was vested in the Miami headquar-

ters and that the district office served largely as an intermediate link between the headquarters and the franchisees. When problems arose over building design, site-development fees, rent computation, and the defaulted payments, Rudzewicz and MacShara learned that the Michigan office was powerless to resolve their disputes and could only channel their communications to Miami. Throughout these disputes, the Miami headquarters and the Michigan franchisees carried on a continuous course of direct communications by mail and by telephone, and it was the Miami headquarters that made the key negotiating decisions out of which the instant litigation arose. See nn. 7, 9, *supra.*

Moreover, we believe the Court of Appeals gave insufficient weight to provisions in the various franchise documents providing that all disputes would be governed by Florida law. The franchise agreement, for example, stated:

> "This Agreement shall become valid when executed and accepted by BKC at Miami, Florida; it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida. The choice of law designation does not require that all suits concerning this Agreement be filed in Florida." App. 72.

See also n. 5, *supra.* The Court of Appeals reasoned that choice-of-law provisions are irrelevant to the question of personal jurisdiction, relying on *Hanson* v. *Denckla* for the proposition that "the center of gravity for choice-of-law purposes does not necessarily confer the sovereign prerogative to assert jurisdiction." 724 F. 2d, at 1511–1512, n. 10, citing 357 U. S., at 254. This reasoning misperceives the import of the quoted proposition. The Court in *Hanson* and subsequent cases has emphasized that choice-of-law *analysis*— which focuses on all elements of a transaction, and not simply on the defendant's conduct—is distinct from minimum-contacts jurisdictional analysis—which focuses at the thresh-

old solely on the defendant's purposeful connection to the forum.[23] Nothing in our cases, however, suggests that a choice-of-law *provision* should be ignored in considering whether a defendant has "purposefully invoked the benefits and protections of a State's laws" for jurisdictional purposes. Although such a provision standing alone would be insufficient to confer jurisdiction, we believe that, when combined with the 20-year interdependent relationship Rudzewicz established with Burger King's Miami headquarters, it reinforced his deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there. As Judge Johnson argued in his dissent below, Rudzewicz "purposefully availed himself of the benefits and protections of Florida's laws" by entering into contracts expressly providing that those laws would govern franchise disputes. 724 F. 2d, at 1513.[24]

### (2)

Nor has Rudzewicz pointed to other factors that can be said persuasively to outweigh the considerations discussed above and to establish the *unconstitutionality* of Florida's assertion of jurisdiction. We cannot conclude that Florida had no "legitimate interest in holding [Rudzewicz] answer-

---

[23] *Hanson* v. *Denckla*, 357 U. S., at 253–254. See also *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S., at 778; *Kulko* v. *California Superior Court*, 436 U. S., at 98; *Shaffer* v. *Heitner*, 433 U. S., at 215.

[24] In addition, the franchise agreement's disclaimer that the "choice of law designation does not *require* that all suits concerning this Agreement be filed in Florida," App. 72 (emphasis added), reasonably should have suggested to Rudzewicz that by negative implication such suits *could* be filed there.

The lease also provided for binding arbitration in Miami of certain condemnation disputes, *id.*, at 113, and Rudzewicz conceded the validity of this provision at oral argument, Tr. of Oral Arg. 37. Although it does not govern the instant dispute, this provision also should have made it apparent to the franchisees that they were dealing directly with the Miami headquarters and that the Birmingham district office was *not* "for all intents and purposes the embodiment of Burger King." 724 F. 2d, at 1511.

able on a claim related to" the contacts he had established in that State. *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S., at 776; see also *McGee* v. *International Life Insurance Co.*, 355 U. S., at 223 (noting that State frequently will have a "manifest interest in providing effective means of redress for its residents").[25] Moreover, although Rudzewicz has argued at some length that Michigan's Franchise Investment Law, Mich. Comp. Laws § 445.1501 *et seq.* (1979), governs many aspects of this franchise relationship, he has not demonstrated how Michigan's acknowledged interest might possibly render jurisdiction in Florida *unconstitutional.*[26] Finally, the Court of Appeals' assertion that the Florida litigation "severely impaired [Rudzewicz'] ability to call Michigan witnesses who might be essential to his defense and counterclaim," 724 F. 2d, at 1512–1513, is wholly without support in the record.[27] And even to the extent that it is inconvenient

[25] Complaining that "when Burger King is the plaintiff, you won't 'have it your way' because it sues all franchisees in Miami," Brief for Appellee 19, Rudzewicz contends that Florida's interest in providing a convenient forum is negligible given the company's size and ability to conduct litigation anywhere in the country. We disagree. Absent compelling considerations, cf. *McGee* v. *International Life Insurance Co.*, 355 U. S., at 223, a defendant who has purposefully derived commercial benefit from his affiliations in a forum may not defeat jurisdiction there simply because of his adversary's greater net wealth.

[26] Rudzewicz has failed to show how the District Court's exercise of jurisdiction in this case might have been at all inconsistent with Michigan's interests. To the contrary, the court found that Burger King had fully complied with Michigan law, App. 159, and there is nothing in Michigan's franchise Act suggesting that Michigan would attempt to assert exclusive jurisdiction to resolve franchise disputes affecting its residents. In any event, minimum-contacts analysis presupposes that two or more States may be interested in the outcome of a dispute, and the process of resolving potentially conflicting "fundamental substantive social policies," *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S., at 292, can usually be accommodated through choice-of-law rules rather than through outright preclusion of jurisdiction in one forum. See n. 19, *supra.*

[27] The only arguable instance of trial inconvenience occurred when Rudzewicz had difficulty in authenticating some corporate records; the

for a party who has minimum contacts with a forum to litigate there, such considerations most frequently can be accommodated through a change of venue. See n. 20, *supra*. Although the Court has suggested that inconvenience may at some point become so substantial as to achieve *constitutional* magnitude, *McGee* v. *International Life Insurance Co.*, *supra*, at 223, this is not such a case.

The Court of Appeals also concluded, however, that the parties' dealings involved "a characteristic disparity of bargaining power" and "elements of surprise," and that Rudzewicz "lacked fair notice" of the potential for litigation in Florida because the contractual provisions suggesting to the contrary were merely "boilerplate declarations in a lengthy printed contract." 724 F. 2d, at 1511–1512, and n. 10. See also *post*, at 489–490 (STEVENS, J., dissenting). Rudzewicz presented many of these arguments to the District Court, contending that Burger King was guilty of misrepresentation, fraud, and duress; that it gave insufficient notice in its dealings with him; and that the contract was one of adhesion. See 4 Record 687–691. After a 3-day bench trial, the District Court found that Burger King had made no misrepresentations, that Rudzewicz and MacShara "were and are experienced and sophisticated businessmen," and that "at no time" did they "ac[t] under economic duress or disadvantage imposed by" Burger King. App. 157–158. See also 7 Record 648–649. Federal Rule of Civil Procedure 52(a) requires that "[f]indings of fact shall not be set aside unless clearly erroneous," and neither Rudzewicz nor the Court of Appeals has pointed to record evidence that would support a "definite and firm conviction" that the District Court's findings are mistaken. *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395 (1948). See also

court offered him as much time as would be necessary to secure the requisite authentication from the Birmingham district office, and Burger King ultimately stipulated to their authenticity rather than delay the trial. See 7 Record 574–575, 578–579, 582, 598–599.

*Anderson* v. *Bessemer City*, 470 U. S. 564, 573–576 (1985). To the contrary, Rudzewicz was represented by counsel throughout these complex transactions and, as Judge Johnson observed in dissent below, was himself an experienced accountant "who for five months conducted negotiations with Burger King over the terms of the franchise and lease agreements, and who obligated himself personally to contracts requiring over time payments that exceeded $1 million." 724 F. 2d, at 1514. Rudzewicz was able to secure a modest reduction in rent and other concessions from Miami headquarters, see nn. 8, 9, *supra;* moreover, to the extent that Burger King's terms were inflexible, Rudzewicz presumably decided that the advantages of affiliating with a national organization provided sufficient commercial benefits to offset the detriments.[28]

## III

Notwithstanding these considerations, the Court of Appeals apparently believed that it was necessary to reject jurisdiction in this case as a prophylactic measure, reasoning that an affirmance of the District Court's judgment would result in the exercise of jurisdiction over "out-of-state consumers to collect payments due on modest personal purchases" and would "sow the seeds of default judgments against franchisees owing smaller debts." 724 F. 2d, at 1511. We share the Court of Appeals' broader concerns and therefore reject any talismanic jurisdictional formulas; "the

---

[28] We do not mean to suggest that the jurisdictional outcome will always be the same in franchise cases. Some franchises may be primarily intrastate in character or involve different decisionmaking structures, such that a franchisee should not reasonably anticipate out-of-state litigation. Moreover, commentators have argued that franchise relationships may sometimes involve unfair business practices in their inception and operation. See H. Brown, Franchising Realities and Remedies 4–5 (2d ed. 1978). For these reasons, we reject Burger King's suggestion for "a general rule, or at least a presumption, that participation in an interstate franchise relationship" represents consent to the jurisdiction of the franchisor's principal place of business. Brief for Appellant 46.

facts of each case must [always] be weighed" in determining whether personal jurisdiction would comport with "fair play and substantial justice." *Kulko* v. *California Superior Court*, 436 U. S., at 92.[29] The "quality and nature" of an interstate transaction may sometimes be so "random," "fortuitous," or "attenuated"[30] that it cannot fairly be said that the potential defendant "should reasonably anticipate being haled into court" in another jurisdiction. *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S., at 297; see also n. 18, *supra.* We also have emphasized that jurisdiction may not be grounded on a contract whose terms have been obtained through "fraud, undue influence, or overweening bargaining power" and whose application would render litigation "so gravely difficult and inconvenient that [a party] will for all practical purposes be deprived of his day in court." *The Bremen* v. *Zapata Off-Shore Co.*, 407 U. S., at 12, 18. Cf. *Fuentes* v. *Shevin*, 407 U. S. 67, 94–96 (1972); *National Equipment Rental, Ltd.* v. *Szukhent*, 375 U. S. 311, 329 (1964) (Black, J., dissenting) (jurisdictional rules may not be employed against small consumers so as to "crippl[e] their defense"). Just as the Due Process Clause allows flexibility in ensuring that commercial actors are not effectively "judgment proof" for the consequences of obligations they voluntarily assume in other States, *McGee* v. *International Life Insurance Co.*, 355 U. S., at 223, so too does it prevent rules that would unfairly enable them to obtain default judgments against unwitting customers. Cf. *United States* v. *Rumely*, 345 U. S. 41, 44 (1953) (courts must not be " 'blind' " to what " '[a]ll others can see and understand' ").

---

[29] This approach does, of course, preclude clear-cut jurisdictional rules. But any inquiry into "fair play and substantial justice" necessarily requires determinations "in which few answers will be written 'in black and white. The greys are dominant and even among them the shades are innumerable.' " *Kulko* v. *California Superior Court*, 436 U. S., at 92.

[30] *Hanson* v. *Denckla*, 357 U. S., at 253; *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S., at 774; *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S., at 299.

For the reasons set forth above, however, these dangers are not present in the instant case. Because Rudzewicz established a substantial and continuing relationship with Burger King's Miami headquarters, received fair notice from the contract documents and the course of dealing that he might be subject to suit in Florida, and has failed to demonstrate how jurisdiction in that forum would otherwise be fundamentally unfair, we conclude that the District Court's exercise of jurisdiction pursuant to Fla. Stat. § 48.193(1)(g) (Supp. 1984) did not offend due process. The judgment of the Court of Appeals is accordingly reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL took no part in the consideration or decision of this case.

JUSTICE STEVENS, with whom JUSTICE WHITE joins, dissenting.

In my opinion there is a significant element of unfairness in requiring a franchisee to defend a case of this kind in the forum chosen by the franchisor. It is undisputed that appellee maintained no place of business in Florida, that he had no employees in that State, and that he was not licensed to do business there. Appellee did not prepare his French fries, shakes, and hamburgers in Michigan, and then deliver them into the stream of commerce "with the expectation that they [would] be purchased by consumers in" Florida. *Ante,* at 473. To the contrary, appellee did business only in Michigan, his business, property, and payroll taxes were payable in that State, and he sold all of his products there.

Throughout the business relationship, appellee's principal contacts with appellant were with its Michigan office. Notwithstanding its disclaimer, *ante,* at 478, the Court seems ultimately to rely on nothing more than standard boilerplate language contained in various documents, *ante,* at 481,

to establish that appellee "'purposefully availed himself of the benefits and protections of Florida's laws.'" *Ante,* at 482. Such superficial analysis creates a potential for unfairness not only in negotiations between franchisors and their franchisees but, more significantly, in the resolution of the disputes that inevitably arise from time to time in such relationships.

Judge Vance's opinion for the Court of Appeals for the Eleventh Circuit adequately explains why I would affirm the judgment of that court. I particularly find the following more persuasive than what this Court has written today:

> "Nothing in the course of negotiations gave Rudzewicz reason to anticipate a Burger King suit outside of Michigan. The only face-to-face or even oral contact Rudzewicz had with Burger King throughout months of protracted negotiations was with representatives of the Michigan office. Burger King had the Michigan office interview Rudzewicz and MacShara, appraise their application, discuss price terms, recommend the site which the defendants finally agreed to, and attend the final closing ceremony. There is no evidence that Rudzewicz ever negotiated with anyone in Miami or even sent mail there during negotiations. He maintained no staff in the state of Florida, and as far as the record reveals, he has never even visited the state.

> "The contracts contemplated the startup of a local Michigan restaurant whose profits would derive solely from food sales made to customers in Drayton Plains. The sale, which involved the use of an intangible trademark in Michigan and occupancy of a Burger King facility there, required no performance in the state of Florida. Under the contract, the local Michigan district office was responsible for providing all of the services due Rudzewicz, including advertising and management consultation. Supervision, moreover, emanated from that office alone. To Rudzewicz, the Michigan office was for all intents and purposes the embodiment

of Burger King. He had reason to believe that his working relationship with Burger King began and ended in Michigan, not at the distant and anonymous Florida headquarters. . . .

"Given that the office in Rudzewicz' home state conducted all of the negotiations and wholly supervised the contract, we believe that he had reason to assume that the state of the supervisory office would be the same state in which Burger King would file suit. Rudzewicz lacked fair notice that the distant corporate headquarters which insulated itself from direct dealings with him would later seek to assert jurisdiction over him in the courts of its own home state. . . .

"Just as Rudzewicz lacked notice of the possibility of suit in Florida, he was financially unprepared to meet its added costs. The franchise relationship in particular is fraught with potential for financial surprise. The device of the franchise gives local retailers the access to national trademark recognition which enables them to compete with better-financed, more efficient chain stores. This national affiliation, however, does not alter the fact that the typical franchise store is a local concern serving at best a neighborhood or community. Neither the revenues of a local business nor the geographical range of its market prepares the average franchise owner for the cost of distant litigation. . . .

"The particular distribution of bargaining power in the franchise relationship further impairs the franchisee's financial preparedness. In a franchise contract, 'the franchisor normally occupies [the] dominant role'. . . .

"We discern a characteristic disparity of bargaining power in the facts of this case. There is no indication that Rudzewicz had any latitude to negotiate a reduced rent or franchise fee in exchange for the added risk of suit in Florida. He signed a standard form contract whose terms were non-negotiable and which appeared

in some respects to vary from the more favorable terms agreed to in earlier discussions. In fact, the final contract required a minimum monthly rent computed on a base far in excess of that discussed in oral negotiations. Burger King resisted price concessions, only to sue Rudzewicz far from home. In doing so, it severely impaired his ability to call Michigan witnesses who might be essential to his defense and counterclaim.

"In sum, we hold that the circumstances of the Drayton Plains franchise and the negotiations which led to it left Rudzewicz bereft of reasonable notice and financially unprepared for the prospect of franchise litigation in Florida. Jurisdiction under these circumstances would offend the fundamental fairness which is the touchstone of due process." 724 F. 2d 1505, 1511–1513 (1984) (footnotes omitted).

Accordingly, I respectfully dissent.