CORNERSTONE ORTHOPEDIC HOSPI-
TAL, Limited Partnership, Plaintiff,

v.

Raul MARQUEZ, M.D., and Jorge
Tijmes, M.D., Defendants.

No. 3:96CV219–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Sept. 9, 1996.

Jay S. Bilas, James P. McLoughlin, Jr., Moore & Van Allen, Charlotte, NC, for plaintiff.

Rex C. Morgan, Baucom, Claytor, Bentron, Morgan, Wood & White, Charlotte, NC, Edmundo O. Rameriz, Ellis Koeneke & Rameriz, LLP, McAllen, TX, for defendants.

## *ORDER*

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on the motion of the Defendant, Raul Marquez, M.D., to dismiss this case for lack of personal jurisdiction (document # 9). For the reasons stated herein, that motion will be denied.

### I. *BACKGROUND*

The pedigree of the Plaintiff in this federal action, Cornerstone Orthopedic Hospital Limited Partnership ("Cornerstone"), provides the context for this dispute. Cornerstone's pedigree is as follows. In May of 1995, National Orthopedics, L.L.C, ("National Orthopedics") formed Hidalgo Orthopedic Hospital, L.L.C., along with Dr. Marquez, Jorge E. Tijmes, M.D., to build and operate a specialty hospital in McAllen, Texas. National Orthopedics, Marquez and Tijmes were limited partners. In 1995 the name of the limited liability company was changed from Hidalgo Orthopedic Hospital, L.L.C. to

Cornerstone Orthopedic Hospital, L.L.C. Later Cornerstone was changed from a limited liability company to a limited partnership and Orthopedics Management was added as the general partner; both entities were formed under the law of North Carolina.

The evidence before the Court shows that Marquez played an active role in the creation of Cornerstone. Marquez, through his counsel, negotiated and helped draft the operating agreement for Hidalgo Orthopedic Hospital, L.L.C. via telephone calls and other communications with individuals in North Carolina, and he signed the articles of incorporation for that entity. This agreement provided the substance for all subsequent agreements that changed the name and corporate form of the entity formed by the parties, and there is evidence that Marquez participated in the decision to change those corporate forms. All of the entities created by the parties were created under North Carolina law.

The operating agreement for the company obliged Marquez to make a capital contribution, to guarantee the debts of the company up to a specified amount, and to provide financial information needed to obtain financing. In connection with the enterprise Marquez also executed a subscription agreement, which obligated Marquez to hold the company harmless against all losses they incurred by reason of his failure to fulfill terms of that agreement; this agreement provided that it would be governed by North Carolina law. Later, when Cornerstone's form was changed from a limited liability company to a limited partnership, the parties, after negotiation, agreed that Marquez could provide land to the partnership in lieu of his capital contribution. Cornerstone's headquarters is in North Carolina; Orthopedics Management and National Orthopedics have their principal place of business in North Carolina.

The parties have had a falling out and, as a result, two lawsuits have been filed. Marquez sued National Orthopedics and Orthopedics Management and others in Texas. Cornerstone has sued Marquez and Tijmes in North Carolina.

Marquez has filed a motion asking this Court to dismiss this federal action for lack of personal jurisdiction. According to Marquez, he has not had the quantity or quality of contacts with North Carolina needed to support the exercise of personal jurisdiction. Cornerstone disagrees.

## II. *DISPOSITION*

■ "The question of personal jurisdiction must be answered through a two step analysis. The Court must determine whether the North Carolina long arm statute is applicable, and if so, whether the exercise of that statutory power will violate the due process clause of the United States Constitution." *Dowless v. Warren–Rupp Houdailles, Inc.,* 800 F.2d 1305, 1306 (4th Cir.1986). The first inquiry is statutory and North Carolina's long-arm statute is to be construed liberally in favor of finding personal jurisdiction to the fullest extent allowed by the Due Process Clause. *See e.g. Dataflow Companies, Inc. v. Hutto,* 114 N.C.App. 209, 212, 441 S.E.2d 580 (1994). The outer limits of the long-arm statute's reach are determined by the requirements of the Due Process Clause, and the Court believes that in this case the jurisdictional question concerns the exercise of specific jurisdiction, because the contacts that Cornerstone relies upon to justify jurisdiction arise from the same agreement that is the subject matter of this dispute. Therefore, this Court must ask whether Marquez has purposefully established "minimum contacts" in the forum state and the litigation results from alleged injuries that "arise out of or relate to" such activity and, if so, whether the exercise of jurisdiction comports with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472–73, 476, 105 S.Ct. 2174, 2182, 2184, 85 L.Ed.2d 528 (1985).

■ Jurisdiction in this case is proper under N.C.G.S. § 1–75.4(5)(a) & (c), North Carolina's "long-arm" statute.[1] That statute provides for personal jurisdiction "in any action which ... [a]rises out of a promise, made anywhere to the plaintiff or to some third party for the plaintiff's benefit, by the

---

1. Given its resolution of this issue the Court need not consider Cornerstone's argument that per-

sonal jurisdiction is proper under N.C.G.S. § 1–75.4(1)(d).

defendant to perform services within the state." N.C.G.S. § 1–75.4(5)(a). It also provides for jurisdiction where an action "[a]rises out of a promise, made anywhere to the plaintiff ... by the defendant to deliver or receive within this State ... documents of title, or other things of value." N.C.G.S. § 1.75.4(5)(c). In this case, Marquez promised to indemnify and hold National Orthopedics (a North Carolina corporation) harmless from any breach of the subscription agreement; he promised to deliver a capital contribution (later land); he promised to provide personal financial information needed to secure financing for the company; and he promised to provide a personal guarantee of certain debts for the company.[2] Both National Orthopedics and Cornerstone are residents of North Carolina, so the evidence at this stage shows that Marquez's promise to perform these acts and to deliver things of value falls within the purview of N.C.G.S. § 1–75.4(5)(a) & (c). *See e.g. Telerent Leasing Corp. v. Equity Associates, Inc.,* 36 N.C.App. 713, 245 S.E.2d 229 (1978); *Wohlfahrt v. Schneider,* 66 N.C.App. 691, 311 S.E.2d 686 (1984); *Munchak Corp. v. Riko Enterprises, Inc.,* 368 F.Supp. 1366 (M.D.N.C.1973).

■ The exercise of personal jurisdiction comports with due process. Here again, the question is whether Marquez has "purposefully established 'minimum contacts' in the forum state" and the litigation "arises out of or relates to" those activities, and also, whether the exercise of jurisdiction comports with "fair play and substantial justice." *Burger King Corp.,* 471 U.S. at 472–73, 476, 105 S.Ct. at 2182, 2184. The Court believes Marquez has purposefully established minimum contacts with this State. The evidence before the Court shows that Marquez played an active role in the formation of the company/partnership that created Cornerstone. In connection with that process Marquez, through his attorney, contacted National Orthopedic or Orthopedic Management personnel in North Carolina to negotiate terms and conditions of the agreement. As a result of these negotiations Cornerstone was formed,

and it was formed under the law of North Carolina. Marquez also signed a subscription agreement that is expressly governed by North Carolina law such that there is no doubt he could avail himself of the courts of North Carolina and North Carolina's law in an effort to enforce that agreement. The agreement he signed created a continuing contractual relationship with National Orthopedics and Orthopedics Management, both North Carolina residents, and in that agreement he promised to undertake activities for the mutual benefit of the parties, some of which could only be performed by sending money or things of value, etc., (ultimately) to National Orthopedics or Orthopedics Management at their offices in North Carolina. This case arises from Marquez's breach of this very agreement. Under these circumstances this Court finds the case indistinguishable from *Burger King, supra,* and finds that Marquez has "purposefully directed" his activities to the forum state and those activities create the minimum contacts that justify the exercise of personal jurisdiction.

The Court also believes that the exercise of jurisdiction in this case comports with traditional notions of "fair play and substantial justice." *See Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184. Marquez is clearly a sophisticated and financially secure individual who was represented by counsel throughout this process, and therefore requiring Marquez to litigate in this forum is not a grave burden. Also, the Court believes that North Carolina clearly has a significant interest in enforcing these types of corporate agreements with its citizens, especially where the corporate entities are formed under the laws of North Carolina and the parties to the agreements expressly avail themselves, to some degree, of state law. Marquez has not provided any compelling reason why jurisdiction in North Carolina is improper.

Marquez's arguments to the contrary are not persuasive. Marquez repeatedly emphasizes that he never visited North Carolina, but it is well-established that physical pres-

---

**2.** In this case, Marquez participated in the forming of the company and its successor, the limited partnership. Under these circumstances the

Court believes that the company/partnership agreement and the subscription agreements must be read together as part of the same agreement.

ence in the forum state is not a prerequisite to jurisdiction. *See Burger King,* 471 U.S. at 475–77, 105 S.Ct. at 2184. Marquez also emphasizes that National Orthopedic solicited his participation in Texas and the bulk of his contractual performance was to take place in Texas. This is true but beside the point because the jurisdictional inquiry turns on his (admittedly minimal) contacts with the forum state; the jurisdictional inquiry does not turn on where the "center of gravity" lies in a given dispute. Here it is clear that once Marquez was solicited he responded by purposefully directing his activities towards North Carolina residents because he was interested in a deal. As noted earlier, the evidence at this point tends to show that Marquez was a prime mover in the organization of business entities under North Carolina law (the decision to avail himself to North Carolina law was as much his as anybody's); and he entered a continuing contractual relationship which created obligations that clearly ran to North Carolina citizens. These are precisely the sorts of prior negotiations and contemplated future consequences that, along with the terms of the contract and the parties' actual course of dealing, suffice to make it reasonably foreseeable that he would be subject to suit here in North Carolina for any breach of his contractual duties. *See Burger King,* 471 U.S. at 477–82, 105 S.Ct. at 2185–87.

Marquez's last argument is the gravamen of his objection, but it is likewise unpersuasive. Relying on *Marriott PLP Corp. v. Tuschman,* 904 F.Supp. 461 (D.Md.1995) Marquez argues that being a limited partner is not enough to create personal jurisdiction. In *Marriott, supra,* the court held that the limited partner before the court was more akin to holder of stocks in a corporation such that the mere fact of passive investment (and attendant activities) did not confer personal jurisdiction. But Marquez was not merely a passive investor in a large limited partnership such that he can be treated like a stockholder in a large corporation. Rather, Marquez was one of three persons (later four) who formed Cornerstone, he had obligations to actively pursue the business of the partnership, and he undertook obligations that are qualitatively different from those as-

sumed by passive investors. Under these circumstances, Marquez's situation is more like that of a general partner than a stockholder such that the Court believes the exercise of personal jurisdiction in this case is proper and *Marriott, supra,* does not control.

For these reasons, Marquez's motion to dismiss this case for lack of personal jurisdiction is hereby denied.

**NOW, THEREFORE, IT IS ORDERED** that Defendant's Motion to Dismiss this case for lack of personal jurisdiction (document # 9) be, and hereby is, **_DENIED._**