[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 348 
Garrett A. Greene appeals from an order setting aside the domestication of a default judgment entered by a California Superior Court against Dr. David M. Connelly, individually and as trustee of the Alabama Plastic Surgery, P.A. Pension Trust. The issue is whether, under California law, Connelly engaged in sufficient contacts with the State of California to subject himself to the in personam jurisdiction of a California superior court.
In 1984, Connelly became interested in investing in applications for cellular telephone licenses issued by the Federal Communications Commission ("FCC"). In urban areas of the country, the FCC established a licensing system under which licenses were granted to provide cellular telephone services in "metropolitan statistical areas" ("M.S.A.s"). To select the licensees, the FCC devised a lottery system.
In 1985, Connelly entered into a contract with American National Cellular, a marketing firm, to prepare and submit an application to operate a cellular telephone system in 15 M.S.A.s. Among the M.S.A.s included in *Page 349 
the application were Visalia, California; Charleston, West Virginia; Johnstown, Pennsylvania; Orange County, New York; Hamilton-Middletown, Ohio; and Fayetteville, North Carolina. American National Cellular was a California company. Connelly paid a fee of $85,000 to American National Cellular, which was remitted to its offices in California. During the preparation of the application, Connelly made several telephone calls to American National Cellular.
After submitting this application, Connelly entered into agreements with other parties to improve his chances of acquiring an interest in a cellular telephone license through the lottery. Along with other applicants, Connelly joined organizations called "lottery groups." One such group Connelly joined was Cellular America Lottery Group, located in Freehold, New Jersey. Under their agreement with Cellular America, Connelly and other applicants agreed that if anyone in the group had his number drawn, he would share ownership with the rest of the lottery group. This agreement with Cellular America, which Dr. Connelly executed, specifically referred to 11 M.S.A.s, of which one was the Visalia, California, market. Dr. Connelly was unaware of the identities of the other members of this lottery group; they were simply people who had made similar applications.
About this time, Garrett Greene also submitted applications for an FCC license and joined another lottery group like Cellular America, called Settlecom, which was located in Washington, D.C. To improve their chances of success still further, Greene and Connelly, independently of each other, joined yet another lottery group, called Cross-Settlecom. Although a separate corporate entity, Cross-Settlecom was managed by Settlecom and was also located in Washington, D.C. Under the Cross-Settlecom agreement, members of different lottery groups agreed to share any interest they acquired by virtue of their original agreement with members of other lottery groups.
Under these agreements, Greene came to share in a minority interest acquired by Connelly. The application of a member of Connelly's lottery group, Cellular America, was drawn in the lottery. As a result of the agreement with Cellular America, Connelly acquired a minority interest in the license for the Visalia M.S.A. By virtue of the Settlecom agreement, Settlecom matched Connelly, who was a member of the winning lottery group, with two members of two other lottery groups, Greene and a third party named J.D. Hughes. Therefore, under the Settlecom agreement, Connelly, Greene, and Hughes each became a 33 1/3% owner of a .5617% minority interest in the Visalia M.S.A. license. Until Connelly received a notification from Settlecom, Connelly had never heard of Greene. The matching was performed solely by Settlecom. Connelly did not become aware that Greene was a California resident until, shortly after the minority interest had been awarded, Greene sent him a letter with a proposed agreement regarding the sharing of the fractional interest. Connelly did not sign and return the agreement. Other than by a letter Connelly sent to Greene in California, the two never communicated. They never spoke over the telephone.
The owner of a 50.01% majority interest in the Visalia-Tulare-Porterville, California, M.S.A. sold its interest to a company called McCaw Communications of the Pacific, Inc. As majority owner of the license, McCaw had authority to dictate all terms of the operation of the license. McCaw managed the license and maintained its offices in Kirkland, Washington. In May 1988, McCaw sent Connelly and all the other owners of an interest in the license a copy of a proposed partnership agreement. The minority interest members of the partnership did not participate in the management of the partnership, except to the extent that one member of the governing executive committee was a minority interest member. Connelly did not enter into this partnership and remained merely a joint holder of a minority interest in the license.
In September 1988, the executive committee sent a "First Capital Call" to Connelly and the other minority interest owners asking them to make a proportionate capital contribution or else risk dilution or forfeiture of their interest. Connelly paid the entire capital call attributable to the .5617% interest *Page 350 
held jointly by Connelly, Greene, and Hughes. In November 1988, Connelly sent Greene, who then, as before, resided in California, a letter informing him of these latest developments and requesting reimbursement. Connelly also sent such a letter to Hughes. In March 1989, Greene responded with a letter, informing Connelly that he would remit his share of the capital call upon receipt of evidence showing Alabama Plastic Surgery's ownership of the 0.5617% interest. Neither Greene nor Hughes ever paid his share of the capital call.
In August 1989, Connelly assigned the .5617% interest in the Visalia M.S.A. and interests he owned in two other M.S.A.s to McCaw Cellular Interests, Inc., a subsidiary of McCaw. After signing this agreement in Montgomery, Alabama, Connelly sent the contract to the offices of McCaw Cellular Interests, Inc., in Kirkland, Washington. For the assignment of the three interests, Alabama Plastic Surgery received $224,000, of which $100,000 was attributable to the interest in the Visalia M.S.A. Connelly did not share the proceeds with either Greene or Hughes.
In January 1990, Greene filed an action for damages against Dr. Connelly, individually and as trustee of the Alabama Plastic Surgery, P.A. Pension Trust, in the California Superior Court for Santa Clara County. Greene alleged conversion, breach of fiduciary duty, fraud, breach of contract, and bad faith denial of contract as a result of the August 1989 assignment of the .5617% interest to McCaw Cellular Interests, Inc. The Sheriff's Department of Montgomery County personally served Connelly with a copy of the summons. Connelly did not appear or otherwise defend, and a default judgment was entered against him on June 6, 1990.
In June 1990, McCaw Cellular Interests, Inc., and McCaw Communications of the Pacific, Inc., filed a declaratory judgment action in the United States District Court for the Middle District of Alabama to determine title to the minority interest that Connelly had assigned to McCaw. On June 20, 1990, Greene filed a "Notice of Filing of Foreign Judgment" in the Circuit Court of Montgomery County, and a certificate of judgment was subsequently issued. In November 1991, the parties to the declaratory judgment action reached a settlement, and on November 13, 1991, Greene filed a "Process of Garnishment" naming Alabama Plastic Surgery, P.A., as garnishee. Connelly and the garnishee were served with process of garnishment; however, neither responded. On January 21, 1992 a writ of execution was filed, and on January 22, 1992, a conditional judgment was entered against Alabama Plastic Surgery, P.A., and it was served on Dr. Connelly on January 27, 1992. On March 9, 1992, Dr. Connelly filed a "Cross-Petition to Vacate Foreign Judgment." After an evidentiary hearing and oral argument, the trial court entered an order setting aside the domestication of the California judgment on the grounds that under California law, Connelly and Alabama Plastic Surgery, P.A. Pension Fund had not engaged in sufficient economic activity within the State of California to subject them to the jurisdiction of its state courts.
We respond initially to Greene's argument that Connelly waived any objection to the validity of and execution on the California state court judgment. Our enactment of the Uniform Enforcement of Foreign Judgments Act, § 6-9-230 et seq., Alabama Code 1975, provides that "a [properly authenticated and filed foreign judgment] has the same effect and is subject to the same procedures, defenses and proceedings for reopening, vacating, or staying as a judgment of a circuit court of this state and may be enforced or satisfied in like manner." §6-9-232. Therefore, once the judgment is domesticated, Connelly must resort to procedures applicable to any other judgment originally entered by a circuit court in order to set it aside.
Rule 60, Ala.R.Civ.P., establishes the grounds on which a party may seek relief from a final judgment, order, or proceeding. Because Connelly's "Cross-petition to Vacate Foreign Judgment" challenged the validity of the California judgment by arguing that it is void for lack of in personam
jurisdiction, it is in essence a Rule 60(b)(4), Ala.R.Civ.P., motion for relief from judgment. Smith v. Clark, 468 So.2d 138
(Ala. 1985). Rule 60 *Page 351 
provides that a Rule 60(b)(4) motion for relief from a judgment shall be made "within a reasonable time." SeeMarshall v. Mid-State Homes, Inc., 468 So.2d 131 (Ala. 1985);McNutt v. Beaty, 370 So.2d 998 (Ala. 1979).
Greene argues that because Connelly waited for a year and nine months before moving to set aside the domesticated California judgment, he did not make his motion within a reasonable time. Under the facts of this case, however, we believe that Connelly's motion to set aside the foreign judgment was made within a reasonable time. Marshall v.Mid-State Homes, Inc., 468 So.2d 131 (Ala. 1985).
The second issue raised by Greene is whether the California Superior Court had in personam jurisdiction to enter a default judgment against Connelly, a nonresident defendant.
The review applicable to a Rule 60(b)(4) motion is de novo. When the grant or denial of relief turns on the validity of the judgment, as under Rule 60(b)(4), discretion has no place. Satterfield v. Winston Indus., Inc., 553 So.2d 61, 64
(Ala. 1989); Smith v. Clark, 468 So.2d 138, 141 (Ala. 1985);Seventh Wonder v. Southbound Records, Inc., 364 So.2d 1173,1174 (Ala. 1978). The only question before us is whether the judgment is void. Satterfield, 553 So.2d at 64; Smith, 468 So.2d at 141; Seventh Wonder, 364 So.2d at 1174. A judgment is void only if the court rendering it lacked jurisdiction over the subject matter or over the parties, or if it acted in a manner inconsistent with due process. Satterfield, 553 So.2d at 64; Smith, 468 So.2d at 141; Seventh Wonder, 364 So.2d at 1174.
The Constitution of the United States, Article IV, Section 1, requires that "full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state." A judgment, therefore, entered by the court of another state having jurisdiction over the subject matter and persons is entitled to full faith and credit in Alabama courts. Teng v. Diplomat National Bank,431 So.2d 1202 (Ala. 1983); Morse v. Morse, 394 So.2d 950 (Ala. 1981).
The validity and effect of a foreign judgment are determined by the law of the state in which it was rendered.Teng, 431 So.2d at 1203; Morse, 394 So.2d at 951; Forbes v.Davis, 187 Ala. 71, 65 So. 516 (1914). If a judgment of a sister state is properly authenticated and filed with the circuit court, §§ 6-9-232, 6-9-233, a presumption arises that the court rendering that judgment had jurisdiction to do so. See Teng, 431 So.2d at 1203. Therefore, the party challenging the judgment has the burden of asserting lack of jurisdiction and producing evidence to overcome the presumption. Id.
We turn first to the law of the state in which the foreign judgment was rendered. The California long-arm statute provides:
 "A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."
Cal.Civil Procedure Code § 410.10 (West 1973). Because California courts have construed this statute to confer personal jurisdiction coextensive with the Due Process Clause of the Fourteenth Amendment, Michigan Nat'l Bank v. SuperiorCourt, 23 Cal.App.3d 1, 6, 99 Cal.Rptr. 823, 826 (1972);Belmont Industries, Inc. v. Superior Court, 31 Cal.App.3d 281,285, 107 Cal.Rptr. 237, 239-40 (1973), the only issue is whether the superior court's exercise of in personam
jurisdiction over Connelly comported with the Due Process Clause as interpreted by the United States Supreme Court. SeeSinatra v. National Enquirer, Inc., 854 F.2d 1191 (9th Cir. 1988); see also Helicopteros Nacionales de Columbia v. Hall,466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).
The Due Process Clause limits the power of a state court to render a valid personal judgment against a nonresident defendant. World-Wide Volkswagen Corp. v. Woodson,444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); Kulko v. SuperiorCourt of California, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132
(1978); MacKinnon v. St. Louis Southwestern Ry., 518 So.2d 89
(Ala. 1987). In order for a state court to assert personal jurisdiction, the nonresident defendant must have "certain minimum contacts with [the *Page 352 
forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "International Shoe Co. v. Washington, 326 U.S. 310, 316,66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The nonresident defendant's conduct and connection with the forum state must be such that he should reasonably anticipate being haled into court there.World-Wide Volkswagen, 444 U.S. at 297, 100 S.Ct. at 567. Thus, the reasonable foreseeability of suit in the forum state is critical to due process analysis. Burger King Corp. v.Rudzewicz, 471 U.S. 462, 476, 105 S.Ct. 2174, 2184,85 L.Ed.2d 528 (1985).
In defining what types of contacts make it reasonable for a potential defendant to anticipate litigation in a foreign jurisdiction, the United States Supreme Court has looked to the reasoning of Hanson v. Denckla, 357 U.S. 235,78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958):
 "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails himself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."
Id. at 253, 78 S.Ct. at 1239-40. See also World-WideVolkswagen, 444 U.S. at 298, 100 S.Ct. at 567. The foreseeability of suit, therefore, depends not only on the extent, but also on the nature, of the nonresident's contacts with the foreign jurisdiction. "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.' " Burger King Corp.,471 U.S. at 475, 105 S.Ct. at 2183 (citations omitted).
In Data Disc, Inc. v. Systems Tech. Assocs., Inc.,557 F.2d 1280 (1977), the Ninth Circuit Court of Appeals articulated the basic principles for determining the extent and quality of contacts to support general and limited or specific forms of inpersonam jurisdiction:
 "If the nonresident defendant's activities within a state are 'substantial' or 'continuous and systematic,' there is a sufficient relationship between the defendant and the state to support jurisdiction even if the cause of action is unrelated to the defendant's forum activities. Perkins v. Benguet Consol. Mining Co., supra, 342 U.S. [437] at 446-47, 72 S.Ct. 413 [at 418-19, 96 L.Ed. 485 (1952);] Wells Fargo Co. v. Wells Fargo Express Co., 556 F.2d 413 [406] (9th Cir. 1977); see also Republic International Corp. v. Amco Engineers, Inc., supra, 516 F.2d [161] at 167 [(9th Cir. 1975)].
 "If, however, the defendant's activities are not so pervasive as to subject him to general jurisdiction, the issue whether jurisdiction will lie turns on an evaluation of the nature and quality of the defendant's contacts in relation to the cause of action."
Id. at 1287. To determine the constitutionality of an exercise of limited or specific jurisdiction, the Ninth Circuit has formulated the following three-part test:
 "1. the non-resident must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails
himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws.
 "2. The claim must be one which arises out of or results from the defendant's forum-related activities.
"3. Exercise of jurisdiction must be reasonable."
Metropolitan Life Ins. Co. v. Neaves, 912 F.2d 1062, 1065 (9th Cir. 1990) (emphasis in the original); Corporate Inv. BusinessBrokers v. Melcher, 824 F.2d 786, 789 (9th Cir. 1987); DataDisc, Inc., 557 F.2d at 1287.
Connelly argues that he lacked sufficient contacts with the State of California because, he argues, Greene's cause of action did not arise out of any economic activity conducted by Connelly in the state. Connelly contends that the claim on which the California default judgment is based arose out of the August *Page 353 
10, 1989, agreement in which Connelly assigned to McCaw the entire .5617% minority interest in the Visalia license. Because this agreement was signed in Alabama and because neither he nor McCaw was a resident of California, Connelly argues that the action brought by Greene did not relate to any economic activity conducted by Connelly in the forum state; therefore, Connelly argues that he lacked sufficient contacts with the forum state.
Greene urges the Court to look at the entire sequence of events surrounding the August 10, 1989, assignment. Although the transactions regarding the Visalia M.S.A. involved companies and events in states other than California, the extra-forum transactions, Greene argues, were entered into for the sole purpose of operating a cellular telephone company in that state. Therefore, he argues, the action arose from a forum-related, economic activity by which Connelly purposefully availed himself of the privilege of conducting activities in California, invoking thereby the benefits and protections of its laws.
We hold that Connelly has failed to overcome the presumption that the California Superior Court had jurisdiction to enter a default judgment against him. We disagree with Connelly's contention that Greene's claims arose out of the sales agreement between Connelly and McCaw, which, Connelly claims, had nothing to do with the State of California. All of Greene's claims are based on the allegation that he owned 33 1/3% of the minority interest that Connelly wrongfully assigned to McCaw. These causes of action arose out of Greene's alleged ownership of a minority interest in a federal license to operate a cellular telephone service in the Visalia, California, M.S.A. Connelly's joint ownership with a California resident of a minority interest in an FCC license to operate cellular telephone service in Visalia, California, constituted a sufficient contact with the forum state to make it reasonably foreseeable that Connelly would be subject to suit there in regard to that interest. Although none of the agreements was negotiated or signed in California and although the communication between Greene and Connelly by correspondence was limited, Connelly established business contacts with California and purposefully availed himself thereby of the benefits and protections of its laws when he initiated a series of transactions to acquire an interest in an FCC license to operate in that state. The ultimate objective of these transactions was, in part, to acquire an interest in a license to provide cellular telephone service in Visalia, California. The fact that Connelly applied for many M.S.A.s outside California or that he acquired his interest in part by aleatory means does not detract from the fact that he purposely filed an application to acquire an FCC license to operate in California.
Furthermore, the third prong of the Neaves test, that the exercise of jurisdiction must be reasonable in order to be constitutional, was also met in the circumstances of this case.
We hold, therefore, that it was reasonable and fair that Connelly should have to appear and defend or suffer a default judgment in an action brought in California arising from partial ownership of a federal license to carry on a particular type of economic activity in California. Because we hold that the California Superior Court's assertion ofin personam jurisdiction over Connelly was consistent with the requirements of the Due Process Clause, we reverse and remand for proceedings consistent with this opinion.
REVERSED AND REMANDED.
ADAMS, HOUSTON, STEAGALL and INGRAM, JJ., concur. *Page 354