688 So.2d 246 (1997)
Ex parte UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO.
Ex parte UNITED PAPERWORKERS INTERNATIONAL UNION, AFL-CIO.
(In re BE&K CONSTRUCTION COMPANY v. UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO, et al.).
1951080, 1951207.
Supreme Court of Alabama.
January 10, 1997.
*247 J. Cecil Gardner, Michael Hamilton and Christopher E. Krafchak of Gardner, Middlebrooks, Fleming & Hamilton, P.C., Mobile, James E. Youngdahl of Youngdahl & Sadin, New Orleans, LA, and John L. Quinn and Robert Weaver of Nakamura & Quinn, Birmingham, for United Paperworkers International Union.
John L. Quinn of Nakamura & Quinn, Birmingham, and Andrew D. Roth, Robert M. Weinberg and Laurence Gold of Bredhoff & Kaiser, P.L.L.C., Washington, DC, for United Brotherhood of Carpenters.
E. Mabry Rogers, F. Keith Covington and John W. Smith T of Bradley, Arant, Rose & White, Birmingham, for BE&K Construction Company.
PER CURIAM.
The United Brotherhood of Carpenters ("UBC") and the United Paperworkers International Union ("UPIU") separately petition this Court for writs of mandamus directing the Jefferson County Circuit Court to grant their motions to dismiss a lawsuit presenting claims of trespass, assault, and civil conspiracy. The writs are denied.
BE&K Construction Company ("BE&K"), a nonunion contractor headquartered in Birmingham, Alabama, sued five separate labor unions, including the UBC and the UPIU, along with four individual union officers, on claims of trespass, assault, and civil conspiracy arising from an alleged campaign by the defendants to prevent BE&K from performing labor contracts in two paper and pulp mills, located in Minnesota and Oregon, respectively. BE&K sought compensation for damage resulting from acts of vandalism and violence it alleged union employees had committed over the course of several months during this campaign.
The UPIU, a labor organization based in Nashville, Tennessee, moved to dismiss upon the condition that it would consent to jurisdiction in Minnesota and waive the statute of limitations as a defense if BE&K filed the same action in Minnesota within 60 days of dismissal, pursuant to Ala.Code 1975, § 6-5-430. The UBC, a national labor organization based in Washington, D.C., moved to dismiss the action, arguing that the Jefferson County Circuit Court lacked personal jurisdiction over it. The other named defendants moved to dismiss the respective claims against them based on various grounds.[1] The trial court denied the UPIU's motion, rejecting its argument that the action against it should be dismissed based on the doctrine of forum non conveniens, as provided in § 6-5-430. The trial court also denied the UBC's motion, holding that it had "general" jurisdiction over the claims against it.
BE&K is a "merit shop" contractor, which means that it employs subcontractors on the basis of the relative merit and price of the subcontractor's bid proposals without regard to whether the subcontractors employ union workers. Much of BE&K's construction work is for various companies in the pulp and paper industry. BE&K's workforce is "nomadic," in that its members legally reside in various states but migrate to sites across the country, sometimes for months at a time, in order to perform work projects that BE&K has contracted for. BE&K has 3,000 to 9,000 *248 such employees, depending upon its workload at any given time; some of these employees are Alabama residents.
BE&K claims that in 1987 the defendants initiated a comprehensive nationwide campaign to force BE&K out of business. BE&K claims that the defendants employed various tactics to discourage industrial owners across the country from using BE&K employees to perform construction work, and that they utilized individuals and local trade unions in a number of states, including Alabama, to coordinate the anti-BE&K activities on construction sites across the country.
In 1989, Boise Cascade, Inc., selected BE&K to perform major construction projects at a pulp and paper mill in International Falls, Minnesota, and at a similar plant in St. Helens, Oregon. Boise Cascade subsequently assigned BE&K the administrative responsibilities over 19 other subcontractors at the International Falls plant. BE&K then constructed a "mancamp" of mobile homes and other portable facilities at that plant, where it housed the nonunion workers it had brought in from across the country to work on the project.
BE&K claims that the UBC and the UPIU, along with the other named defendants, chose the International Falls project as its target for anti-BE&K activities, conspired to prevent BE&K from carrying out its obligation to Boise Cascade, and mounted a campaign of harassment, violence, and "strategic tactics" to accomplish that end. It alleged that this campaign began at the International Falls plant in July 1989, when union employees walked off their jobs there in protest of the company's hiring of BE&K. BE&K then brought in additional employees, referred to by the defendants as "scab" labor, to perform the union members' jobs; its doing so led to increased acts of violence and harassment. Members of various unions began picketing at the International Falls jobsite, the BE&K mancamp, and the BE&K on-site personnel office, and, BE&K alleges, vandalized cars and property.
BE&K claims that on July 21, 1989, union members stopped a bus carrying BE&K employees to the International Falls jobsite, began beating on the bus, and smashed its windows. Although BE&K thereafter obtained a temporary restraining order in the District Court of Koochiching County, Minnesota, the tension at the International Falls jobsite intensified. The picketing continued intermittently, and BE&K claims that union officials and members from various parts of the country arrived in International Falls to help plan ways to continue harassing BE&K by "furtive and anonymous" means. On August 28, 1989, a group of 70-100 union employees allegedly arrived in International Falls by chartered bus and then gathered in front of the BE&K personnel office, attempting to block access to it and threatening BE&K employees. Thereafter, BE&K fenced in its mancamp and hired a security company to monitor the mancamp and worksite.
On September 9, 1989, 200 to 400 persons assembled at the International Falls plant mancamp for a confrontation that escalated into a full-scale riot. The mob destroyed the fence around the mancamp and entered the area, broke windows, overturned vehicles, set trailers on fire, assaulted the security officers, and otherwise vandalized the mancamp. The International Falls police eventually calmed the melee and arrested 56 rioters.
Over the next three years, there were continued reported acts of violence, harassment, and vandalism at the International Falls site, which BE&K alleges were caused by the UBC, the UPIU, and other labor organizations. BE &K alleges that the unions' employees systematically collected license plate numbers from the vehicles of BE&K employees and sent them to representatives in the licensees' home states to obtain information about the licensees' identity; BE&K specifically alleged that some of the license numbers were sent to UBC representative Rudolph Clay in Vinemont, Alabama. BE&K also alleges that the various unions produced flyers and handbills that favorably described the International Falls riot and threatened similar riot activity at other mills employing BE&K workers, particularly at a mill in Arkansas. BE&K also claims that union workers at the Boise Cascade plant in St. Helens, Oregon, began aggressive *249 picketing after the riot at International Falls.
With these facts in mind, we first address whether the trial court erred in refusing to dismiss the action against the UPIU without prejudice, on the basis of § 6-5-430. That section provides:
"Whenever, either by common law or the statutes of another state or of the United States, a claim, either upon contract or in tort has arisen outside this state against any person or corporation, such claim may be enforceable in the courts of this state in any county in which jurisdiction of the defendant can be legally obtained in the same manner in which jurisdiction could have been obtained if the claim had arisen in this state; provided, however, the courts of this state shall apply the doctrine of forum non conveniens in determining whether to accept or decline to take jurisdiction of an action based upon such claim originating outside this state; and provided further that, if upon motion of any defendant it is shown that there exists a more appropriate forum outside this state, taking into account the location where the acts giving rise to the action occurred, the convenience of the parties and witnesses, and the interests of justice, the court must dismiss the action without prejudice. Such dismissal may be conditioned upon the defendant or defendants filing with the court a consent (i) to submit to jurisdiction in the identified forum, or (ii) to waive any defense based upon a statute of limitations if an action on the same cause of action is commenced in the identified forum within 60 days of the dismissal."
This section requires the trial courts of this state to apply the doctrine of forum non conveniens in deciding whether to exercise jurisdiction over a cause of action accruing outside the state. Ex parte Southern Ry., 556 So.2d 1082 (Ala.1989). All of the factors under this section must be positively found to justify a dismissal, and the defendant has the burden of proving those factors. Donald v. Transport Life Ins. Co., 595 So.2d 865 (Ala.1992). Whether to dismiss an action based on the doctrine of forum non conveniens is within the sound discretion of the trial court, and its ruling on that issue will not be reversed absent an abuse of that discretion. Ex parte Preston Hood Chevrolet, Inc., 638 So.2d 842 (Ala.1994).
Under § 6-5-430 the trial court must consider where the acts giving rise to the action occurred, the convenience of the parties and the witnesses, and the interests of justice, when determining whether to dismiss an action under the doctrine of forum non conveniens. Additionally, the trial court should consider the location of the evidence and any other relevant matter, in order to assess the degree of any actual difficulty and hardship that will result to the defendant by litigating the case in the plaintiff's chosen forum. Ex parte Southern Ry., supra.
Considering the factors set out in § 6-5-430, we hold that BE& K's choice of Alabama as the forum in which to litigate this action should not be disturbed. Although it is undisputed, as the UPIU points out, that many of the acts giving rise to BE&K's claims occurred at the International Falls plant in Minnesota, that fact alone does not warrant a dismissal based on § 6-5-430. Of paramount importance is the fact that BE&K is an Alabama corporation, with its headquarters in Birmingham. See Ex parte Integon Corp., 672 So.2d 497 (Ala.1995); Ex parte Preston Hood Chevrolet, supra. BE&K employs Alabama citizens and pays taxes in this state; therefore, Alabama has a compelling interest in the outcome of this litigation, especially in light of BE&K's allegation that the UPIU conspired to put it out of business.
We also note that the very nature of BE&K's claims makes it impossible to balance the scales of convenience so as to satisfy everyone who may be called to testify in this case. BE&K has alleged a conspiracy to conduct a national campaign of confrontation, which BE&K says culminated in a riot at the International Falls plant in Minnesota and in an incident at Boise Cascade's St. Helens plant in Oregon. BE&K anticipates that witnesses to these incidents, as well as witnesses to an incident that occurred at a mill in McGehee, Arkansas, will be called to testify. *250 Furthermore, the UPIU's headquarters is located in Nashville, Tennessee, and the UBC's headquarters is located in Washington, D.C.; therefore, it would be reasonable for BE&K to anticipate calling witnesses from those localities as well. The United States Supreme Court stated in Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255-56, 102 S.Ct. 252, 265-66, 70 L.Ed.2d 419 (1981), that "[w]hen the home forum has been chosen, it is reasonable to assume that this choice is convenient." This Court has also recognized that it makes little sense to move a case from Alabama to another forum in order to accommodate out-of-state witnesses when to do so would necessarily inconvenience those witnesses who reside within Alabama. See Keelean v. Central Bank of the South, 544 So.2d 153, 158 (Ala.1989) ("It has not been shown how the parties and witnesses will be inconvenienced in coming to Alabama to litigate this matter, any more than the plaintiffs would be inconvenienced in having to go to Florida"). This Court in Ex parte Auto-Owners Ins. Co., 548 So.2d 1029, 1032 (Ala. 1989), quoting the United States Supreme Court's first authoritative statement on the doctrine of forum non conveniens in Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), noted that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." This Court also emphasized in Ex parte Auto-Owners that "[t]he prevailing question of whether a case should be entertained or dismissed depends largely upon the facts of the particular case and is in the sound discretion of the trial judge." 548 So.2d at 1032, quoting Restatement (Second) of Conflict of Laws § 84 at 251 (1971). The pertinent facts in this case do not indicate that the balance of considerations is so strongly in favor of the UPIU as to justify a holding by this Court that the trial court abused its discretion in refusing to dismiss BE&K's action.
We now address the issue whether the trial court erred in determining that the UBC is subject to the general jurisdiction of Alabama courts and may reasonably be compelled to litigate the claims against it here. The UBC emphasizes that the Due Process Clause of the 14th Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant, and it argues that the trial court does not have such power here.
In International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the United States Supreme Court established the "minimum contacts" standard, geared toward assessing the inherent fairness of compelling a nonresident defendant to submit to a state's jurisdiction, based upon the nature of the defendant's contacts with the forum state. The Court carefully distinguished the difference between "specific" personal jurisdiction, which applies when an action arises directly out of forum-based activities, and "general" personal jurisdiction, which applies when the action is not directly founded on forum-based activity. International Shoe, 326 U.S. at 317, 66 S.Ct. at 158-59. While a showing of certain minimum contacts suffices to support a holding of specific jurisdiction, the plaintiff must go further and establish that the defendant's contacts with the forum have been "continuous and systematic" in order to invoke general jurisdiction. Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952); Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Even where the necessary level of contact between the nonresident defendant and the forum state exists, the Due Process Clause may nevertheless act to divest the state of its power to render a valid judgment. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Thus, the judicial inquiry into the question of general jurisdiction has two prongs; first, the Court must examine the defendant's contacts with the forum; if they reach the proper constitutional level, the Court must then assess the constitutionality of exercising jurisdiction, based upon considerations of fair play and substantial justice. World-Wide Volkswagen Corp., 444 U.S., at 292, 100 S.Ct. at 564-65; Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).
*251 The United States Supreme Court has given some guidance in determining what level of contact is systematic and continuous enough to justify the imposition of a state's general jurisdiction over a foreign defendant. For example, in Perkins v. Benguet Consolidated Mining Co., supra, an Ohio state court sought to exercise general jurisdiction over a mining company whose properties were in the Philippine Islands, but whose operations there were completely halted during the Japanese occupation of the islands during World War II. During that interim, the president of the company, who was also its general manager and principal stockholder, returned to his home in Ohio and there maintained an office, where he kept business files, carried on business correspondence, drew and distributed salary checks to employees, and generally conducted most of the day-to-day operations of his company. He also maintained two active Ohio bank accounts with substantial balances, used a local bank as a transfer agent for the stock of the company, held directors' meetings in his home, dispatched funds to cover the costs of buying new machinery for the Philippines operations, and supervised the overall post-war rehabilitation of his business. The Supreme Court found that these activities constituted a continuous and systematic supervision of the necessarily limited wartime activities of the company, and were sufficient to subject the mining operation to the general jurisdiction of the Ohio court.
In Helicopteros Nacionales, supra, the Supreme Court held that the nature and quantity of a Colombian corporation's contacts with Texas were not sufficient to subject it to the general jurisdiction of that state's courts in a wrongful death case brought by a Texas resident. The Court noted that the defendant corporation had no place of business in Texas and was not licensed to conduct business there, then went on to examine the substance of the defendant's limited contacts with Texas. These contacts consisted of the defendant's sending its chief executive officer to Houston to negotiate a major transportation-services contract with a Texas company; receiving $5 million in payment on the contract by means of a check drawn on a Houston bank; purchasing 80% of its helicopter fleet, along with other equipment and training services, from a Texas corporation; and sending personnel to the Texas corporation's facilities for training. Helicopteros Nacionales, 466 U.S. at 417, 104 S.Ct. at 1873-74. These contacts, while significant, represented an isolated period of contact that was tied to one business transaction, albeit a large one; thus, this contact was not sufficiently continuous and systematic to support a finding of general jurisdiction over the defendant. Helicopteros Nacionales, 466 U.S. at 416, 104 S.Ct. at 1872-73.
Few Alabama cases have specifically addressed the issue of what contacts will subject a defendant to the general jurisdiction of this state's courts, and those that have done so have focused on the activities of corporations seeking to avail themselves of profit in this state. In Ex parte Newco Mfg. Co., 481 So.2d 867 (Ala.1985), the widow of a repairman who died when he was struck by a falling machine filed a products liability action against the foreign manufacturer of a small part that had been incorporated into the machine. This Court noted that the foreign manufacturer systematically marketed its goods to residents of this state, either through an independent manufacturer representative or by telephone and mail contact. Although these sales amounted to only $65,000 to $85,000 over a five-year period, this Court found that it was a continuous and deliberate course of merchandising on the part of the foreign manufacturer, which sought to benefit from those activities in Alabama, and that such contact invoked the general jurisdiction of this state's courts. Likewise, in Atlanta Auto Auction, Inc. v. G & G Auto Sales, Inc., 512 So.2d 1334 (Ala. 1987), this Court determined that a Delaware automobile auction company, which was not licensed to do business in Alabama, nevertheless purposefully targeted Alabama residents through a continuous and systematic course of mail services, and it held that this was sufficient contact to invoke personal jurisdiction over the company.[2] Because the nonresident *252 defendants in Newco and Atlanta Auto Auction initiated contacts with the state solely for their own profit, availing themselves of the privileges of conducting business here, this Court determined that such activities were sufficiently systematic and continuous to support a finding of general jurisdiction, and determined that it was fair and reasonable under the Due Process Clause to invoke such jurisdiction.
This case differs from Newco and Atlanta Auto Auction in that the UBC is an unincorporated, nonprofit entity whose purpose is to promote the pro-labor goals of its members, not to avail itself of the privileges of doing business with Alabama residents. The UBC does not maintain an office, a bank account, or property in Alabama. It does maintain the membership of 10 local affiliates, whose 2,584 resident members represent only one-half of one percent of the UBC's total membership. The UBC concludes that its lack of property or formal attachment to the state, its nonprofit status, and the presence of only a small percentage of its membership in this state conclusively show that its contacts are not systematic and continuous and thus do not invoke this state's general jurisdiction in this action.
We note that in 1994 the UBC's Alabama membership collectively paid $198,022 in dues and that the UBC paid over $50,000 in funeral benefits to Alabama members. Although the UBC's collection of dues is not for profit, it is systematic and continuous. During the period in question, the UBC maintained Rudolph Clay, a local representative of the general president, who provided the UBC with weekly reports concerning anti-BE&K activities throughout the state. The UBC has consistently directed and/or supported pro-union activities at Alabama jobsites, and has conducted rallies, funded radio advertisements, held press conferences, and provided handbills for members to distribute at jobsites that employ nonunion workers. Although Alabama members of the UBC do not constitute a large portion of its overall organization, they do maintain a continuous relationship with the UBC in order to systematically further their admitted goal of discouraging contractors who do not provide union labor.
Our review does not end with this conclusion, however; we must next determine whether the exercise of such jurisdiction is reasonable under the Due Process Clause. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The United States Supreme Court has explained that a determination of the reasonableness of a state court's exercise of jurisdiction depends on a variety of factors. The court must consider the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, and the interstate judicial system's interest in obtaining the most efficient resolution of controversies; Burger King Corp., supra, and Asahi Metal Industry Co., Ltd., supra. Having noted earlier that BE&K is an Alabama corporation; and having concluded that Alabama has a compelling interest in the outcome of this litigation and that the burden on the out-of-state defendants that would be imposed by defending in Alabama and the inconvenience of certain witnesses in appearing in Alabama are not so great as to overcome BE&K's choice of forum, we must also conclude that traditional notions of fair play and substantial justice would not be violated if the UBC is required to submit to the jurisdiction of an Alabama court.
For the foregoing reasons, the writs are denied.
WRITS DENIED.
HOOPER, C.J., and ALMON, SHORES, HOUSTON, and KENNEDY, JJ., concur.
MADDOX and BUTTS, JJ., dissent.
MADDOX, Justice (dissenting).
The defendants in this case are seeking the same kind of relief defendants in FELA actions *253 sought for yearsthe right to have the case tried where the cause of action arose. The Legislature, in 1987, adopted what is now § 6-5-430, Ala.Code 1975, to allow defendants like these to ask that the action be dismissed. Robert D. Hunter, who served as special counsel on tort reform when the Legislature passed the so-called tort reform package, which included what is now § 6-5-430, stated the following about the forum non conveniens statute:
"Venue is the place of trial. Before the passage of Alabama's tort reform legislation, Alabama's rules governing venue were subject to abuse in three areas.
"First, article XII, section 232 of the Alabama Constitution provides the terms under which foreign corporations may do business in Alabama. This section further provides that such corporations may be sued in any county where they do business. Cases held that this constitutional directive took precedence over the statutory venue considerations that apply to suits against other categories of defendants. Citizens of Alabama, therefore, found themselves defending suits in counties where they neither resided nor did business, merely because a foreign corporation was included as a defendant and the foreign corporation did business in the county where the suit was brought. Proponents of reform saw no reason for rules of venue for claims against citizens of Alabama to be overruled by a foreign corporation's presence in the suit.
"Second, once the plaintiff selected an appropriate jurisdiction under section 232 or under Alabama's statutory venue provision, the case could not be transferred for the convenience of the parties and witnesses. This restriction added to the expense of litigation and afforded plaintiffs an almost unchecked ability to forum shop within the state. Litigation was at times unduly expanded by the inclusion of a `venue' defendant to secure a favorable forum.
"Finally, actions having no contact with Alabama were being `imported' for trial in Alabama's courts. This case importation was most prevalent in actions under the Federal Employers Liability Act. Such cases could not be removed to federal court, where transfer under the doctrine of forum non conveniens might be available. Cases not arising in Alabama and not involving any Alabama citizens as litigants might nonetheless be tried at the expense of Alabama's taxpayers.
"These problems were addressed by three measures in the tort reform package: (1) Act No. 87-164 (constitutional amendment relating to venue for foreign corporations); (2) Alabama Code section 6-3-21.1 (forum non conveniens); and (3) Alabama Code section 6-5-430 (foreign causes of action).
". . . .
"The ability to transfer cases within Alabama for the convenience of parties and witnesses and in the interest of justice was denied Alabama courts prior to passage of Alabama Code section 6-3-21.1 in this tort reform effort. Courts are now required to transfer a case to a county in which the case originally might have been filed if the convenience of the parties and witnesses or the interests of justice so dictate. Although the statute uses the mandatory term `shall,' judicial discretion will necessarily be involved in considering the factors of convenience and the interest of justice.
"As introduced, the forum non conveniens proposal referred only to a `change' of venue. Although the Alabama Constitution grants courts the power to `change' venue, existing statutes speak in terms of both a `change' and a `transfer' of venue. One `change' of venue for cause is permitted any party, while a defendant may move for `transfer' of venue as provided in the Alabama Rules of Civil Procedure. Those who drafted section 6-3-21.1 were of the view that venue was `changed' and actions were `transferred,' a view apparently shared by those who drafted Alabama Rule of Civil Procedure 82. During the course of Senate debate, the reference was expanded to included `change or transfer' of venue. This language was altered to insure that section 1(b), which specified the new right, was considered cumulative to previously existing rights.

*254 "While the new section 6-2-21.1 grants courts the power to employ the forum non conveniens doctrine on an intrastate level, the amendment to Alabama Code section 6-5-430, by Act No. 87-182, grants that power on an interstate level. Interstate forum non conveniens is the concept expressed as follows by the Restatement (Second) of Conflict of Laws: `A state will not exercise jurisdiction if it is a seriously inconvenient forum for the trial of the action provided that a more appropriate forum is available to the plaintiff.' Most states exercise the doctrine in accepting or declining jurisdiction over cases arising outside their borders.
"A court of one state lacks the power to transfer an action to the court of another state, but the following options are available to the court wishing to decline jurisdiction:
"(1) The case may be dismissed;
"(2) the case may be dismissed, conditioned upon the defendant's consent to acceptance of service of process in the more appropriate jurisdiction and waiver of statute of limitations defenses; or,
"(3) the case may be stayed pending institution of suit and service or process on the defendant in the more appropriate forum.
"As introduced, H. 26 incorporated the first of the above alternatives and required a court to dismiss a foreign cause of action when a more convenient forum for the case existed outside Alabama. The Governor pointed out that since section 6-5-430 involved subject matter jurisdiction, which cannot be waived, it would be abused by a defendant who allowed all applicable limitation periods for bringing a suit to expire before challenging the jurisdiction of the Alabama court. Under such circumstances, the plaintiff would be left with no means of pursuing his claim. The Governor proposed that ACJRC [Alabama Civil Justice Reform Committee] accept the second of the alternatives listed above and that the court be allowed to condition dismissal of a foreign cause of action on a defendant's consent to the jurisdiction of the more appropriate forum and waiver of certain defenses based on statutes of limitation. ACJRC consented to this amendment to its bill, and the bill was passed without further significant change."
Robert D. Hunter, Alabama's 1987 Tort Reform Legislation, 18 Cumb.L.Rev. 282, 286-91 (1988) (footnotes omitted).
It appears to me that the sole purpose for adopting the doctrine of forum non conveniens in 1987 was to allow the courts to dismiss an action when a more convenient forum existed outside the state. I agree with the reasons Justice Butts states in his dissenting opinion for concluding that the trial judge abused his discretion in not applying the statute and dismissing this action on the basis that a more convenient forum exists outside Alabama.
BUTTS, Justice (dissenting).
I respectfully dissent from the majority opinion. As to the issue of forum non conveniens raised in case no. 1951207, the majority correctly recognizes that, under Ala.Code 1975, § 6-5-430, the Court is required to weigh these factors in determining whether to dismiss an action under the doctrine of forum non conveniens: (1) where the acts giving rise to the action occurred, (2) the convenience of the parties and witnesses, (3) the interests of justice, (4) the location of the evidence, and (5) any other matter relevant to an assessment of the degree of actual difficulty and hardship that will result to the defendant by litigating the case in the plaintiff's chosen forum. Ex parte Southern Ry., 556 So.2d 1082 (Ala.1989). However, after reciting these factors, the majority simply ignores the evidence that United Paperworkers International Union, AFL-CIO ("UPIU"), presented as to each of them.
UPIU has shown that none of the acts giving rise to this action took place in Alabama, or even in a closely neighboring state; on the contrary, it is clear that the target of the alleged anti-BE&K Construction Company ("BE&K") campaign was in International Falls, Minnesota, and that the lawsuit centers on activities that allegedly took place *255 there.[3] UPIU has shown that it is the citizens of International Falls, not of Alabama, who have been involved in and affected by the ongoing conflict between BE&K and UPIU. It is the Minnesota courts that have adjudicated BE&K's petitions for injunctions against the defendants, and it is the Minnesota economy that has been consistently affected by the union unrest.
UPIU has shown that it will call at least 28 residents of Minnesota to testify at trial, including managers from Boise Cascade and others who were eyewitnesses present in International Falls during the period in question. Most of these witnesses are unaffiliated with UPIU and have no particular impetus to travel from Minnesota to Alabama merely to testify live, when they could comfortably give deposition testimony where they reside. However, because many of the alleged acts, including the riot, took place over six years ago, the credibility of eyewitness testimony and the need for cross-examination are particularly crucial to UPIU's defense; under these circumstances, depositions would be an especially poor substitute for live testimony.
In the face of this evidence, the majority holds that the only fact of "paramount importance" is that BE&K is an Alabama corporation headquartered in Birmingham. Moreover, the majority holds that the nature of the case virtually assures that someone will be inconvenienced by it and, even though it is not certain whether BE&K will even call witnesses from Alabama, the majority finds no reason to risk a possible inconvenience to them.
I do not agree that BE&K's mere corporate residence in Alabama is sufficient to justify litigating this lawsuit thousands of miles away from the place where it primarily arose, where the most compelling evidence is found, and where reside a large number of witnesses whose live testimony is critical to UPIU's defense. Moreover, I do not agree that a mere chance of inconvenience for Alabama witnesses who have not yet been named should outweigh the definite and prohibitive inconvenience of trying to bring 28 named witnesses from International Falls to Alabama to give the live testimony that is essential to UPIU's defense.
While the plaintiff's choice of forum should rarely be disturbed, UPIU has clearly shown how the parties and witnesses will be inconvenienced in coming to Alabama to litigate this matter. Under these circumstances, I would hold that the interests of justice would be better served by granting UPIU's petition for the writ of mandamus and directing the trial court to enter an order granting UPIU's motion to dismiss this action without prejudice.
As to the issue of general jurisdiction raised in case no. 1951080, I agree with the majority that Alabama has sufficient contacts with UBC to establish its general jurisdiction over this lawsuit. However, even where the necessary level of contact between the nonresident defendant and the forum state exists, the Due Process Clause may nevertheless divest the state of its power to render a valid judgment. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The judicial inquiry into general jurisdiction has two prongs; first, the court must examine the defendant's contacts with the forum and, if they reach the proper constitutional level, the court must then assess the constitutionality of imposing jurisdiction, based upon considerations of fair play and substantial justice. World-Wide Volkswagen, 444 U.S. at 292, 100 S.Ct. at 564-65; Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County, 480 U.S. 102, 107 S.Ct. 1026, *256 94 L.Ed.2d 92 (1987). I would not, as the majority has done, summarily hold that the second prong has been met here.
In analyzing this second prong, the court must consider the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interstate judicial system's interest in obtaining the most efficient resolution of controversies; Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); Asahi Metal Industry Co., supra. Even where the facts show the necessary level of contact to impose general jurisdiction, such jurisdiction will not normally apply, because it is difficult to establish the factors necessary to meet the fair and reasonable test. See 2 J. Moore, Federal Practice, ¶ 4.25, pp. 4-258 through 4-267 (2d ed. 1982).
I do not believe this test has been met here. The Boise Cascade jobsite and areas surrounding International Falls, Minnesota, stand at the center of this lawsuit. That is the place where the vast majority of acts were alleged to have been committed, where critical witnesses to these acts reside, and where the community has spent years debating and absorbing the turbulence of this bitter labor dispute. In contrast, none of the acts complained of occurred in Alabama, the burden of bringing key witnesses to Alabama is an onerous one, and the Alabama citizenry has had little exposure to or impact from the acts at issue. I would therefore conclude that, notwithstanding the application of general jurisdiction, the judicial inefficiency of attempting to litigate this lawsuit thousands of miles from its focal point must necessarily overshadow BE&K's right to choose Alabama as its forum. The structure of the Due Process Clause forbids a state court to exercise personal jurisdiction over a foreign defendant under circumstances that would offend "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Because I believe such circumstances are present in this case, I would grant UBC's petition for the writ of certiorari and direct the trial court to enter an order dismissing BE&K's claims against UBC, without prejudice.
NOTES
[1] The following defendants' motions to dismiss were granted, based on the trial court's lack of personal jurisdiction over the defendants: William P. Lukawski, Jr., representative of the general president of the UBC and a resident of Minnetonka, Minnesota; Marc J. Furman, representative of the general president of the UBC, a resident of Portland, Oregon; the Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, Local No. 728, a labor organization having its principal office in Iron Mountain, Michigan; and the International Association of Bridge, Structural and Ornamental Iron Workers, Local No. 783, a labor organization having its principal office in Milwaukee, Wisconsin. Defendant Rudolph H. Clay, a former international representative for the UBC, a resident of Vinemont, Alabama, moved to dismiss or, in the alternative, for a summary judgment; the trial court granted the summary judgment motion.
[2] See, also, Murray v. Alfab, Inc., 601 So.2d 878 (Ala.1992), wherein this Court discussed both specific and general jurisdiction in the context of a contract dispute, without specifying which level of personal jurisdiction was applicable, and held that personal jurisdiction over the defendant Murray had been invoked; and Greene v. Connelly, 628 So.2d 346 (Ala.1993), wherein this Court differentiated between general and specific jurisdiction, but applied the elements of specific jurisdiction.
[3] UPIU does acknowledge that an allegation in BE&K's complaint that Rudolph Clay, a representative of United Brotherhood of Carpenters and Joiners of America, AFL-CIO ("UBC"), residing in Alabama, received from UBC a list of license plate numbers allegedly taken from the automobiles of Alabama-based BE&K workers who had traveled to International Falls to work on the Boise Cascade project; UPIU alleged that Clay provided UBC with information about these Alabama residents based on information he obtained from tracing the car tags. As UPIU points out, however, the trial court has entered a summary judgment in Clay's favor on that allegation, apparently holding that the evidence clearly shows that the acts did not take place. BE&K did not appeal from the summary judgment for Clay. UPIU correctly states that all other acts alleged took place outside Alabama, and primarily in International Falls.