Gerald Worthy and Merion Worthy appeal from the trial court's order granting a motion to dismiss filed by Cyberworks Technologies, Inc. (hereinafter referred to as "Cyberworks"), on the basis that the trial court lacked personal jurisdiction over Cyberworks. We affirm.
On October 4, 1999, the Worthys sued Soho Technologies, Inc. ("Soho"), Cyberworks, Cornerstone International ("Cornerstone"), and Nathaniel R. Kinsella, vice president of operations for Cornerstone, *Page 973 
alleging fraud, violation of the "Alabama Telemarketing Act," § 8-19A-1
et seq., Ala. Code 1975, and violation of Alabama's "Deceptive Trade Practices Act," § 8-19-1 et seq., Ala. Code 1975. On October 22, 1999, Cyberworks filed a motion to dismiss, arguing that the trial court lacked jurisdiction over it and that service of process on it had been insufficient. The motion further stated (1) that Cyberworks was incorporated in Utah, with its principal place of business in Salt Lake City, Utah; (2) that Cyberworks had no contacts with the State of Alabama; and (3) that Cyberworks did not transact business in the State of Alabama and had made no contacts with the Worthys. On November 12, 1999, the affidavit of Scott Alexander, the president of Cyberworks, was submitted in support of the motion to dismiss.
On January 26, 2000, the Worthys filed a response to Cyberworks' motion to dismiss; they argued that Cyberworks had sufficient contacts with the State of Alabama for the trial court to exercise jurisdiction over it as a nonresident defendant by operation of Rule 4.2, Ala.R.Civ.P., and applicable caselaw. They also specifically alleged, as they had in their complaint, that Kinsella was an officer, employee, or agent of Cyberworks. Their response stated, in pertinent part, the following underlying facts to their action:
 "The [Worthys] responded to an advertisement in the Mobile Press Register for a seminar put on by Soho Technologies after which time they were contacted via telephone by Nathan Kinsella. Kinsella informed the [Worthys] that in order to be successful at the marketing scheme which he was promoting, they needed to become proficient in the internet and further convinced the [Worthys] that certain mentoring sessions would be provided to allow them to obtain quick wealth if they agreed to charge large amounts to various credit cards. Kinsella also advised the [Worthys] that he could get them a web page prepared and designed for the various business interests that the [Worthys] had been introduced to at a [s]eminar apparently conducted by Soho . . . . Kinsella and other representatives of Cornerstone . . . had several telephone conversations with the [Worthys] in Alabama and represented to them that he would make all of the arrangements to have a web page designed for them by a company that they worked with or were involved with. Kinsella never directly mentioned Cyberworks to the [Worthys]. The [Worthys] gave Kinsella several credit card numbers so that they could pay for the web page and other alleged services to be performed. . . . When the [Worthys] received their bill they noticed a charge from Cyberworks."
The Worthys also attached to their response a letter, dated March 30, 1999, from Cyberworks' employee Shawn Crumley to the Worthys' attorney and a copy of a check written on a Cyberworks' account to Cornerstone in the amount of $24,684.68, with a commission sheet showing most of the amount of the check represented a commission from a purchase made by the Worthys. On October 2, 2000, the Worthys filed a supplemental response to Cyberworks' motion to dismiss, attaching as exhibits a copy of a long-distance telephone bill of Cyberworks that showed that it had made two calls to the Worthys, the transcribed deposition of Alexander, and several copies of completed "Scholarship Guarantee and Agreement" forms as evidence that Cyberworks had conducted Internet marketing workshops in several states, although Alabama was not one of those states. *Page 974 
On January 25, 2001, Cyberworks filed a brief in reply to the Worthys' response. Cyberworks attached as exhibits the affidavit of Alexander, portions of Alexander's transcribed deposition testimony, and a copy of a purchase contract the Worthys entered into with Soho. On February 18, 2001, the trial court granted Cyberworks' motion to dismiss by noting the following on the face of the motion to dismiss:
 "1. Motion to dismiss filed by Cyberworks Institute is granted.
". . . .
 "2. The fact that Cornerstone did business with Cyberworks is not sufficient reason for the Plaintiff to sue in Ala[bama] [Cyberworks]."
On March 19, 2001, the Worthys filed a motion to alter, amend, or vacate the order of dismissal. On March 26, 2001, Cyberworks filed a response to the Worthys' postjudgment motion. On May 3, 2001, the trial court denied the Worthys' postjudgment motion and certified its order of dismissal as final pursuant to Rule 54(b), Ala.R.Civ.P. On June 8, 2001, the Worthys filed a notice of appeal to this Court.
On appeal, the Worthys argue that the trial court erred in granting Cyberworks' motion to dismiss because, it says, Cyberworks had sufficient contacts with Alabama for the trial court to exercise jurisdiction over it as a nonresident defendant. They also assert that the standard of review applicable to a summary judgment applies in this case. We infer from their brief that they assert that the summary-judgment standard is the appropriate standard because the trial court considered matters outside the pleadings in granting the motion to dismiss. See Rule 12(c), Ala.R.Civ.P. However, the Committee Comments on 1973 adoption of Rule 12 state, in pertinent part:
 "Affidavits, depositions, answers to interrogatories and similar evidentiary matter may be presented on a motion under Rule 12. Such matter is freely considered on a motion attacking jurisdiction."
(Citing Williams v. Minnesota Mining Mfg. Co., 14 F.R.D. 1 (S.D.Cal. 1953).) See also Williams v. Skysite Communications Corp., 781 So.2d 241
(Ala.Civ.App. 2000). Thus, the appropriate standard of review applicable to this case is de novo: "An appellate court considers de novo a trial court's judgment on a party's motion to dismiss for lack of personal jurisdiction." Elliott v. Van Kleef, [Ms. 1001395, January 11, 2002]*
___ So.2d ___ (Ala. 2002) (citing Greene v. Connelly, 628 So.2d 346 (Ala. 1993); Skysite Communications, supra).
The Worthys argue that Rule 4.2, Ala.R.Civ.P., is sufficiently broad to subject Cyberworks to jurisdiction in an Alabama court. The portions of Rule 4.2, Alabama's long-arm rule governing out-of-state service, relied upon by the Worthys, state:
"(a) Basis for Out-of-State Service.
". . . .
 "(2) Sufficient Contacts. A person has sufficient contacts with the state when that person, acting directly or by agent, is or may be legally responsible as a consequence of that person's
"(A) transacting any business in this state;
 "(B) contracting to supply services or goods in this state;
". . . . *Page 975 
 "(E) causing injury or damage in this state to any person by breach of warranty expressly or impliedly made in the sale of goods outside this state when the person might reasonably have expected such other person to use, consume, or be affected by the goods in this state, provided that the person also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;
". . . .
 "(I) otherwise having some minimum contacts with this state and, under the circumstances, it is fair and reasonable to require the person to come to this state to defend an action. The minimum contacts referred to in this subdivision (I) shall be deemed sufficient, notwithstanding a failure to satisfy the requirement of subdivisions (A)-(H) of this subsection (2), so long as the prosecution of the action against a person in this state is not inconsistent with the constitution of this state or the Constitution of the United States."
With regard to the application of Rule 4.2, this Court has stated:
 "Rule 4.2, Ala.R.Civ.P., extends the personal jurisdiction of Alabama courts to the limits of due process under the federal and state constitutions. Sieber v. Campbell, 810 So.2d 641
(Ala. 2001). Rule 4.2(a)(2), Ala.R.Civ.P., Alabama's long-arm rule, sets out situations in which a nonresident defendant's contacts with this State are considered sufficient to subject the nonresident defendant to personal jurisdiction in an Alabama court. Subsection (I) of Rule 4.2(a)(2) contains a `catch-all' provision, which permits jurisdiction over a nonresident defendant whose contacts with this State do not fall into one of the situations listed in Rule 4.2(a)(2)(A)-(H). . . .
 "This Court has interpreted the due process guaranteed under the Alabama Constitution to be coextensive with the due process guaranteed under the United States Constitution. See Alabama Waterproofing Co. v. Hanby, 431 So.2d 141, 145 (Ala. 1983), and DeSotacho, Inc. v. Valnit Indus., Inc., 350 So.2d 447, 449 (Ala. 1977). See also Rule 4.2, Ala. R. Civ. P., Committee Comments on 1977 Complete Revision following Rule 4.4, under the heading `ARCP 4.2.' (`Subparagraph (I) was included by the Committee to insure that a basis of jurisdiction was included in Alabama procedure that was coextensive with the scope of the federal due process clause . . . .').
 "The Due Process Clause of the Fourteenth Amendment permits a forum state to subject a nonresident defendant to its courts only when that defendant has sufficient `minimum contacts' with the forum state. International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The critical question with regard to the nonresident defendant's contacts is whether the contacts are such that the nonresident defendant '"should reasonably anticipate being haled into court"' in the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473 (1985), quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295 (1980). The sufficiency of a party's contacts are assessed as follows:
 "`Two types of contacts can form a basis for personal jurisdiction: general contacts and specific contacts. General contacts, which give rise to *Page 976 
 general personal jurisdiction, consist of the defendant's contacts with the forum state that are unrelated to the cause of action and that are both "continuous and systematic." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n. 9, 415 . . . (1984); [citations omitted]. Specific contacts, which give rise to specific jurisdiction, consist of the defendant's contacts with the forum state that are related to the cause of action. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-75 . . . (1985). Although the related contacts need not be continuous and systematic, they must rise to such a level as to cause the defendant to anticipate being haled into court in the forum state. Id.'
 "Ex parte Phase III Constr., Inc., 723 So.2d 1263, 1266 (Ala. 1998) (Lyons, J., concurring in the result). Furthermore, this Court has held that, for specific in personam jurisdiction, there must exist `a clear, firm nexus between the acts of the defendant and the consequences complained of.' Duke v. Young, 496 So.2d 37, 39 (Ala. 1986). See also Ex parte Kamilewicz, 700 So.2d 340, 345 n. 2 (Ala. 1997).
 "In the case of either general in personam
jurisdiction or specific in personam jurisdiction, `[t]he "substantial connection" between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State.' Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 112 (1987). This purposeful-availment requirement assures that a defendant will not be haled into a jurisdiction as a result of '"the unilateral activity of another person or a third person."' Burger King, 471 U.S. at 475, quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417 (1984).
 "Only after such minimum contacts have been established does a court then consider those contacts in the light of other factors — such as the burden on the defendant of litigating in the forum state and the forum state's interest in adjudicating the dispute, Burger King, 471 U.S. at 476-77 — to determine whether the exercise of personal jurisdiction over the nonresident defendant comports with '"traditional notions of fair play and substantial justice."' Brooks v. Inlow, 453 So.2d 349, 351 (Ala. 1984), quoting International Shoe, 326 U.S. at 316. See also Burger King, 471 U.S. at 476-77."
Elliott v. Van Kleef, 830 So.2d at 731.
The Worthys contend that Cyberworks had the requisite minimum contacts with Alabama through Kinsella and Cornerstone, which, they say, were agents of Cyberworks. The record contains the following evidence and submissions regarding contacts with Alabama by Cyberworks and its alleged agents:
1. An affidavit of Alexander, president of Cyberworks, that states, in pertinent part:
 "2. Cyberworks . . . is a Utah corporation with its only place of business in Salt Lake City, Utah. It has never transacted any business in the State of Alabama nor has it entered the State of Alabama in any attempt to transact business. The company develops and maintains Internet web pages. The company was contacted by someone from Cornerstone . . ., which is believed to be a telemarketing company, and was *Page 977 
 requested to submit a bid to Cornerstone for a portion of the work contracted between Cornerstone and Soho . . . with Mr. [and] Mrs. Worthy. There was never any contact between Defendant Cyberworks . . . and the Worthys."
2. A letter dated March 30, 1999, to the Worthys' attorney from Shawn Crumley, whose signature appears on the letter on behalf of Cyberworks, that, in pertinent part, states:
 "This is concerning the letter sent to . . . Cyberworks . . . dated March 16th, 1999. After research into the [sale] made by Cornerstone . . . to Gerald G. and Merion Leslie Worthy, we have found that the total [sale] amounted to $42,015.00. Cornerstone . . . made this [sale] representing some of Cyberworks['] . . . products.
 "Cyberworks . . . received $11,064.54 from this [sale]. Cornerstone . . . received $30,954 for the purchase. I have included the check paid to Cornerstone . . . and commission sheet for this transaction. Cyberworks . . . no longer has a relationship with Cornerstone . . . ."
3. A copy of the check and the commission sheet showing that Cyberworks received $42,015 from the Worthys and that Cornerstone's commission on the sale was $30,954.46.
4. A copy of a long-distance telephone bill showing that Cyberworks made two telephone calls to the Worthys' residence, both on June 15, 1998.
5. The transcribed deposition testimony of Alexander, in which he discussed the relationship that existed between Cyberworks and Cornerstone, and Cyberworks' contacts with Alabama, as follows:
 "Q. [the Worthys' attorney] . . . All right. Let's talk about the transaction that brings us to where we are today. First of all, let's go back and ask this question. Tell me when you first heard of anybody connected with Cornerstone . . . or when you first began to have any kind of dealings with Cornerstone . . . or any of its agents or representatives?
 "A. To the best of memory, that was probably sometime in March of '98.
". . . .
 "Q. How did you come in contact with the folks at Cornerstone . . .?
"A. I believe it was probably from a phone call.
"Q. From them or from you?
"A. From them. They contacted us.
 "Q. Did they speak to you or did they speak to somebody else in your company?
 "A. They spoke to me — well, they possibly could have spoken to someone else before, but I'm not aware of any contact prior to when I spoke to them.
". . . .
 "Q. And who was it at Cornerstone that first made contact with you in March of '98?
"A. I believe it was Shad Glover and John Lowry.
". . . .
 "Q. All right. And tell me what the substance of that conversation was, as you recall?
 "A. They basically related that they were a marketing company, they did telesales, and that they could — they were going to make sales and they were wondering if we would actually do the — build the Web sites that they would sell.
"Q. Did they tell you what they were marketing?
". . . .
 "A. Well, yeah, that they would be marketing Web sites, but that they couldn't provide that fulfillment and *Page 978 
 they were wondering if we would build the Web sites that they sold.
 "Q. What else? Did they tell you they were marketing any other products aside from Web sites?
 "A. Some support that goes along with Web sites, a coaching program, banners and impressions. Basically just support for the Web site.
 "Q. And this was just a telephone call initially, and did it follow with a personal interview with these folks?
 "A. Yeah, they came up to the office and we sat down and talked a bit.
". . . .
 "Q. Tell me what the outcome of those conversations were? In other words, what — I assume that led [to] you all doing some sort of business with Cornerstone?
 "A. It just led to basically that they were going to begin to sell. And when they made a sale, [then] we would fulfill the Web site for that sale.
 "Q. [Did you] provide them with some sort of a price list or some means by which they could determine the value of your services?
 "A. We didn't provide anything in writing. It was basically, as I mentioned earlier, just kind of a handshake agreement.
 "Q. What did you tell them in terms of how much Cyberworks would charge for services?
"A. I don't have any recollection of that.
". . . .
 "Q. What were they supposed to do after you had this conversation with them and had the handshake? What was the subject of the agreement?
 "A. I don't really know what they were supposed to do. Basically, just contact us if they made a sale.
". . . .
 "Q. . . . Okay. Did you discuss with them the parameters of their responsibility under the agreement? That is, what type of services they could sell, where they could make the sales, [where] they could solicit?
 "A. No, basically the only things we discussed in that meeting were what we could provide. They actually — they — we didn't discuss how they would solicit or how they would market or where or any of that. They really — in fact, I didn't even know what to expect at that point.
 "Q. Did you have any further discussions with them after that additional meeting?
 "A. Yeah, most definitely when they would make a sale, they would contact us.
". . . .
 "Q. [Did] you know the methods they were going to utilize in order to solicit or market Cyberworks['] parts or services?
"A. I do not know.
"Q. You all did not discuss that?
 "A. I recall them saying they would use telesale, telemarketing, using the telephone to contact people, but other than that, any specifics weren't discussed.
 "Q. Did they indicate to you what areas or states or geographic regions they would target?
"A. No, they did not.
 "Q. Did you give them any direction or instructions as to what areas or geographic regions or states they should target?
"A. No, we did not.
"Q. Did it matter to you?
"A. I didn't believe so, no. *Page 979 
 "Q. Did you expect that they would target the entire country or certain portions of the country?
 "A. I don't really believe I even ever thought of that or considered that.
". . . .
 "Q. Do you know if there were any other sales in the State of Alabama other than the Worthy sale?
"A. To my knowledge, no.
 "Q. Do you know whether there were any other solicitations in the State of Alabama, other than the Worthy sale?
"A. I don't know that.
". . . .
 "Q. All right. When you agreed to allow Cornerstone to solicit your product and services — or to market your product and services, did you provide them with credit-card information so they could charge [a] customer's credit cards directly to [Cyberworks]?
"A. No.
". . . .
 "Q. Okay. How did that work? How was it they were able to charge this to the person's credit card and have payment go directly to Cyberworks?
 "A. They had to contact us with each individual transaction.
 "Q. Was there a person in your office they would have contacted about that?
"A. Me, that would have been me.
". . . .
 "Q. Okay. So they didn't have control over any of your credit-card machines or any of that information?
"A. No, they contacted me at every transaction.
 "Q. All right. Now, in this case, the entire $42,015 was charged and payable to Cyberworks; correct?
"A. Correct.
 "Q. Then Cyberworks turned around and cut a check back to Cornerstone for commission; is that correct?
"A. Correct.
". . . .
 "Q. Okay. Were there ever any sales or proposed sales in any state that were rejected by you or anyone at Cornerstone — I'm sorry, Cyberworks?
"A. Not that I am aware of, no.
 "Q. When they solicited someone, there was nobody that you recall rejecting, based on the residence of that person?
"A. Not that I can recall.
". . . .
 "Q. . . . Prior to June of '98 and during June of '98, did you ever — or your company ever do any advertising in the State of Alabama?
"A. No.
 "Q. Had you ever done any business in the State of Alabama?
"A. No.
 "Q. Did you then or do you now own any property in the state?
"A. No.
". . . .
 "Q. . . . Scott, on these Web sites, that you were designing, that were contracted to you by Cornerstone, did they control how you were doing — how you were constructing these Web sites?
"A. No.
 "Q. Were they, meaning Cornerstone, supervising Cyberworks as to the construction of the Web site?
"A. No.
". . . .
 "Q. Were they involved in any steps of Web-site development?
"A. No, they were not. *Page 980 
 "Q. Did they provide any of the computer equipment or work space for you to design on those Web sites?
"A. No, they did not.
". . . .
 "Q. All right. Now, when they made a sale and your company was to design a Web site, how did your company determine what was to be placed on or how that Web site was to be constructed?
"A. The business owner would send us information.
". . . .
 "Q. Under this agreement, how was the business owner to know that Cyberworks existed?
 "A. I don't know how they were to know that. I am sure that they told them where to send their information to have their Web site built.
". . . .
 "Q. Did your company, to your knowledge, ever have any direct contact with the Worthys?
"A. No, we did not.
 "Q. Do you all keep records of telephone calls to customers?
 "A. Well, no, I take that back. I do believe — I'm not certain, but I think we made contact with the Worthys at one point to find out if they were going to be sending their information for their Web site. I'm not certain about that, but I have a slight recollection that we did call them at some point after the sale to find out if they were going to be sending their information to us."
Based on the information contained in the record, we initially conclude that Cyberworks' contacts with Alabama do not support an exercise of general jurisdiction by an Alabama court because its contacts were not "`continuous and systematic.'" Elliott v. Van Kleef, 830 So.2d at 730 (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408,414 n. 9 (1984)). Furthermore, Cyberworks' two telephone calls to the Worthys, standing alone, are not contacts sufficient to invoke specificin personam jurisdiction because they do not provide "`a clear, firm nexus between the acts of the defendant and the consequences complained of.'" Elliott v. Van Kleef, 830 So.2d at 731 (quoting Duke v. Young,496 So.2d 37, 39 (Ala. 1986), and citing Ex parte Kamilewicz,700 So.2d 340, 345 n. 2 (Ala. 1997)).
Therefore, we must consider whether Cornerstone and Kinsella were agents of Cyberworks, as the Worthys argue, to determine whether their contacts with the Worthys will support an exercise of specific inpersonam jurisdiction over Cyberworks. In regard to our consideration of whether an agency relationship exists, this Court has stated:
 "`"The test for agency is whether the alleged principal has retained a right of control over the actions of the alleged agent."' Ex parte Wild Wild West Social Club, Inc., 806 So.2d 1235, 1241 (Ala. 2001) (quoting Gist v. Vulcan Oil Co., 640 So.2d 940, 942 (Ala. 1994)). . . . The party asserting the existence of an agency relationship has the burden of presenting sufficient evidence to prove the existence of that relationship. See Ex parte Wild Wild West Social Club, 806 So.2d at 1242 (citing Mardis v. Ford Motor Credit Co., 642 So.2d 701, 704 (Ala. 1994)). Agency may not be presumed. Ex parte Wild Wild West Social Club, 806 So.2d at 1242 (citing Carlton v. Alabama Dairy Queen, Inc., 529 So.2d 921 (Ala. 1988)). The plaintiff must present substantial evidence of an agency relationship. Id."
Dickinson v. City of Huntsville, 822 So.2d 411, 416 (Ala. 2001). "Evidence is `substantial' *Page 981 
if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Id. (quoting West v. Founders Life AssuranceCo. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review of the record shows that the Worthys failed to produce substantial evidence that Cyberworks had a right of control over Cornerstone or Kinsella. Thus, they have failed to meet their burden of proving that an agency relationship existed between Cyberworks and Cornerstone or between Cyberworks and Kinsella. We therefore conclude that the trial court did not err in granting Cyberworks' motion to dismiss because Cyberworks' actions cannot be said to have been "purposefully directed" toward Alabama; Cyberworks should not be haled into an Alabama court based upon "'"the unilateral activity of another person or a third person."'" SeeElliott v. Van Kleef, 830 So.2d at 731 (quoting Asahi Metal Indus., Co.v. Superior Court of California, 480 U.S. 102, 112 (1987), and BurgerKing Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985), in turn quotingHelicopteros Nacionales, 466 U.S. at 417). The judgment of the trial court is due to be affirmed.
AFFIRMED.
Moore, C.J., and See, Brown, and Stuart, JJ., concur.
* Note from the reporter of decisions: On April 12, 2002, the Alabama Supreme Court withdrew its January 11, 2002, opinion and substituted another opinion. The quoted material appears in the April 12, 2002, substituted opinion.